**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS; PORT
ORFORD OCEAN RESOURCE TEAM;
SAN FRANCISCO CRAB BOAT
OWNERS ASSOCIATION,
        *Plaintiffs-Appellants,*

v.

REBECCA M. BLANK, in her official
capacity as Acting Secretary of the
United States Department of
Commerce; NATIONAL MARINE
FISHERIES SERVICE; NATIONAL
OCEANIC AND ATMOSPHERIC
ADMINISTRATION,
        *Defendants-Appellees.*

No. 11-17108

D.C. No.
3:10-cv-04790-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
August 7, 2012—San Francisco, California

Filed September 10, 2012

Before: Consuelo M. Callahan and Paul J. Watford,
Circuit Judges, and Edward R. Korman,
Senior District Judge.*

*The Honorable Edward R. Korman, Senior District Judge for the U.S.
District Court for Eastern New York, sitting by designation.

Opinion by Judge Callahan

**COUNSEL**

Mark A. White and Andrea Kendrick, Chapman Popik & White LLP, San Francisco, California; Mary L. Hudson (argued), Law Office of Mary L. Hudson, Sausalito, California; Alan Waltner, Law Offices of Alan Waltner, San Francisco, California, for the plaintiffs-appellants.

Ignacia S. Moreno, Meredith Flax, Romney Philpott, Joseph Matthews, Brian C. Toth (argued), U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Mariam McCall, Office of General Counsel, National Oceanic & Atmospheric Administration, Seattle, Washington, for the defendants-appellees.

Shirish Gupta, San Mateo, California, for amicus curiae Food & Water Watch, Inc.

Michael F. Scanlon and J. Timothy Hobbs (argued), K&L Gates LLP, Seattle, Washington, for amici curiae Environmental Defense Fund, United Catcher Boats, and Midwater Trawlers Cooperative.

---

**OPINION**

CALLAHAN, Circuit Judge:

In 2011, the National Marine Fisheries Service ("NMFS") and the Pacific Fishery Management Council ("Pacific Council" or "Council") adopted changes to the fishery management plan for the trawl sector of the Pacific Coast groundfish fishery. The changes, adopted as Amendments 20 and 21 to the PacificCoast Groundfish Fishery Management Plan, are designed to increase economic efficiency through fleet consolidation, reduce environmental impacts, and simplify future decisionmaking.

Plaintiffs-Appellants Pacific Coast Federation of Fishermen's Associations, et al. ("plaintiffs") are a collection of primarily non-trawl fishermen's associations and groups whose longtime participation in the fishery may shrink under Amendments 20 and 21. They argue that the Amendments are unlawful under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884, which imposes procedural and substantive requirements for managing fisheries, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, which imposes purely procedural requirements for reviewing the potential environmental effects of proposed agency actions.

The district court, which had jurisdiction pursuant to 16 U.S.C. § 1861(d) and 28 U.S.C. § 1331, granted summary judgment to the defendants. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm. NMFS[1] complied with the MSA's provisions, which required the agency to consider fishing communities but did not require it to develop criteria for allocating fishing privileges to such communities or to restrict privileges to those who "substantially participate" in the fishery. NMFS also complied with NEPA by preparing a separate study for each amendment, analyzing a reasonable range of alternatives, adequately evaluating potential environmental effects, and adopting flexible mitigation measures designed, in part, to lessen the potential adverse effects of Amendments 20 and 21 on fishing communities. The plaintiffs reasonably disagree with the balance NMFS struck between competing objectives, but they do not show that NMFS exceeded its statutory authority under the MSA or ignored its obligations under NEPA.

---

[1]The plaintiffs' MSA arguments concern both NMFS and Pacific Council because both agencies share responsibility for implementing that statute. In contrast, only NMFS has obligations under NEPA. For ease of reference, we refer simply to "NMFS" throughout this opinion.

## BACKGROUND

### A. Statutory and regulatory background

#### 1. The MSA

##### a. Fishery management plans

The MSA establishes eight Fishery Management Councils composed of fishing representatives and government and tribal officials. 16 U.S.C. § 1852. The Councils are charged with preparing fishery management plans for fisheries that require "conservation and management." *Id.* § 1852(h)(1). Plans must contain measures to "prevent overfishing and rebuild overfished stocks," *id.* § 1853(a)(1)(A), and "assess and specify," among other things, the "optimum yield" from each fishery, *id.* § 1853(a)(3); *see also* 50 C.F.R. § 600.10 (defining "optimum yield").

To the extent measures are necessary to reduce overall harvest to prevent overfishing, a fishery management plan must allocate any harvest restrictions fairly and equitably among the commercial and recreational sectors that participate in the fishery. 16 U.S.C. § 1853(a)(13), (14). Plans may include restrictions on fish catch or gear types, establish a limited access system in order to achieve optimum yield, or include any other measures "determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(3), (4), (6), (14). Plans must comply with ten national standards. *Id.* §§ 1851(a), 1853(a)(1)(C), 1854(a)(1)(A). As relevant here, National Standard 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available." *Id.* § 1851(a)(2); *see also* 50 C.F.R. § 600.315(b)(1). National Standard 8 requires that

> [c]onservation and management measures shall, consistent with the conservation requirements of this

chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard 2], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8); *see also* 50 C.F.R. § 600.345(b)(2).[2]

The Fishery Management Councils submit fishery management plans for review by the public and review and approval by NMFS, acting on behalf of the Secretary of Commerce. 16 U.S.C. § 1854(a). The Councils and NMFS follow the same process for regulations to implement a given plan. *Id.* §§ 1853(c), 1854(b).

### b.   Limited access programs

Beginning in 1990, the Fishery Management Councils began to regulate certain fisheries by adopting programs limiting those who could enter and participate in the fisheries. *See* 16 U.S.C. § 1853(b)(6) (authorizing "limited access system[s] . . . in order to achieve optimum yield"). These programs were referred to as "individual fishing quota" programs, under which individual fishery participants received privileges to harvest a specific quantity of fish.

In 1996, Congress imposed a temporary moratorium on new quota programs until the National Academy of Sciences

---

[2]"Fishing community" means a "community which is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes fishing vessel owners, operators, and crew and United States fish processors that are based in such community." 16 U.S.C. § 1802(17).

studied those programs and their effects on fishing communities. Pub. L. No. 104-297, § 108(f), 110 Stat. 3559, 3577-79 (1996). The resulting report concluded that quota programs can be effective solutions to a host of fishery-related problems, including economic inefficiency, overcapitalization (too many resources directed at too few fish), and overfishing, but that such programs also can have serious adverse impacts on fishing communities. The report ultimately recommended lifting the quota moratorium, subject to the report's guidance. The report noted that quota programs are most likely to be successful when their objectives are clear and there is "broad stakeholder support and participation." Finally, the report emphasized the need for quota programs to be designed on a fishery-by-fishery basis.

In 2007, Congress reauthorized the MSA and lifted the quota moratorium by adding a section that authorizes "limited access privilege programs." Pub. L. No. 109-479, § 106, 120 Stat. 3575, 3586 (2007) (codified at 16 U.S.C. § 1853a). Under such programs, of which quota programs are a subset, fishery participants receive "privileges" (or, in the case of quota programs, "quota shares") to harvest a certain portion of the total catch allowed for a particular species. 16 U.S.C. § 1802(26). NMFS and the Fishery Management Councils must structure limited access programs in accordance with various requirements, some of which concern fishing communities and form the basis of the plaintiffs' arguments in this case. *See infra* Discussion, § A (discussing 16 U.S.C. § 1853a(c)(3), (5)).

## 2.  NEPA

NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions. *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983). NEPA's mandate is purely procedural. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *Neigh-*

*bors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002).

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under NEPA's implementing regulations, 40 C.F.R. §§ 1500-1508 (1986), an agency prepares a draft EIS in which it evaluates the proposed action and its direct, indirect, and cumulative environmental impacts and compares the proposed action with reasonable alternatives, including a "no action" alternative, *id.* § 1502.14. The agency then circulates the draft EIS for public review and comment. *Id.* §§ 1502.19, 1503.1. The agency reviews and responds to any comments, makes any appropriate changes to the EIS, and then circulates the final EIS. *Id.* § 1503.4. Finally, the agency selects an alternative and issues a decision. *Id.* § 1505.2.

## B.　Factual background

### 1.　The Pacific groundfish fishery

The Pacific groundfish fishery extends 200 miles into the Pacific Ocean, along the coasts of California, Oregon, and Washington, and includes more than 90 species of fish that dwell near the sea floor. Fishers use many different types of gear, including trawl nets (nets dragged by boats along the sea floor), traps, and longlines, but trawls dominate. The trawl sector consists of two fisheries, one targeting Pacific whiting (hake) and another targeting non-whiting species. The non-trawl sector includes fishers who use what is called "fixed gear," such as longlines and pots, and primarily targets sablefish.

Every two years, the Pacific Council establishes catch limits, called "optimum yields" or "annual catch limits," which "represent an annual quantity of fish that the groundfish fish-

ery as a whole may catch." Catch limits are divided among different sectors of the fishery, such as between trawlers and fixed gear fishers; these divisions are called "allocations." Prior to Amendments 20 and 21, the Council enforced catch limits primarily by regulating the number of fishing trips. The Council also used gear restrictions and seasonal and area closures. Through trip limits the Council was able to measure and restrict harvests, but it was not able to comprehensively measure or limit "bycatch," which refers to non-targeted (and often overfished) species that are incidentally caught and discarded. Indeed, before Amendments 20 and 21, bycatch was recorded on only one-quarter of non-whiting trawl fishing trips.

In mixed-stock fisheries like the Pacific groundfish fishery, harvests of healthy species are constrained by measures to protect overfished species, "even if those species are not targeted by any particular fishery." The result is sub-optimal harvests. Between 1999 and 2002, seven species were designated as overfished and have since had very low catch limits. *See NRDC v. Evans*, 290 F. Supp. 2d 1051, 1052-53 (N.D. Cal. 2003). The Council has made various efforts over the years to achieve optimum yields in the trawl fishery while reducing adverse impacts to these overfished species. Nonetheless, "biological, social, and economic concerns" have remained, and the fishery has continued to be viewed as "unsustainable."

## 2.   Amendments 20 and 21

In 2003, the Pacific Council set out to develop a program for better managing the Pacific groundfish fishery. The Council ultimately settled on a goal to

> [c]reate and implement a capacity rationalization plan that increases net economic benefits, creates individual economic stability, provides for full utilization of the trawl sector allocation, considers envi-

ronmental    impacts,    and    achieves    individual
accountability of catch and bycatch.[3]

The Council also set other goals, such as simplifying the pro-
cess for making allocations and reducing Pacific halibut
bycatch.

Work on a plan to achieve these goals began in earnest in
2006, with public workshops, Council meetings, and structur-
ing of alternative courses of action. The Council decided to
divide its goals into two proposals, one for rationalization of
the trawl sector and another for allocations and Pacific halibut
bycatch. Accordingly, NMFS prepared a separate draft and
final EIS for each proposal, evaluating alternatives, consider-
ing the alternatives' potential environmental and economic
consequences, and discussing possible mitigation. The public
was invited to comment on each version of each EIS, as well
as on all proposed and final rules. *See* Pacific Coast Ground-
fish Fishery Management Plan, Amendments 20 and 21,
Trawl Rationalization Program, 75 Fed. Reg. 60,868, 60,868
(Oct. 1, 2010) (codified at 50 C.F.R. pt. 660).

In August 2010, NMFS approved Preferred Alternative 4b
as Amendment 20, and various preferred alternatives as
Amendment 21. NMFS issued regulations codifying the
Amendments about two months later. 75 Fed. Reg. at 60,868.
Amendment 20 ("Trawl Rationalization") divides the trawl
fishery into three sectors[4] and then assigns a discrete number

---

[3]According to the Amendment 20 EIS, "rationalization" is "meant to
encompass a variety of measures intended to improve the management of
groundfish resources, in part by improving the economic efficiency of the
fishery." NMFS focused on rationalizing the trawl sector because of its
historic dominance and superior harvesting abilities.

[4]These sectors are: (1) on-shore whiting and non-whiting vessels; (2)
off-shore whiting motherships (which process catch from other vessels);
and (3) off-shore catcher-processors, which process their own catch on
board. The plaintiffs here challenge only the provisions of Amendments
20 and 21 pertaining to the on-shore, non-whiting sub-sector.

of fishing privileges within each sector. For the on-shore sector, privileges are initially allocated based on catch history and then become freely transferable after two years. Liberal transferability is expected to yield economic efficiency and bycatch reductions, but it also may force out participants from local fishing communities by consolidating privileges and making them more expensive. All trawl vessels must employ observers who measure the number of target fish caught and the number of non-target fish discarded as bycatch. Finally, Amendment 20 includes various measures to reduce adverse impacts to fishing communities. *See infra* Discussion, §§ A.1, B.4.

Besides limiting Pacific halibut bycatch, Amendment 21 ("Intersector Allocation") does various things to support Amendment 20, the most important of which is to fix allocations of 19 groundfish stocks among the various trawl and non-trawl sectors. For other species, the Pacific Council will continue to assign allocations every two years. Amendments 20 and 21 were implemented on January 1, 2011. *See* 75 Fed. Reg. at 60,868; Pacific Coast Groundfish Fishery Management Plan, Amendments 20 and 21, Trawl Rationalization Program, 75 Fed. Reg. 78,344, 78,344 (Dec. 15, 2010) (codified at 50 C.F.R. pt. 660).

## C.   Procedural background

The plaintiffs filed suit in October 2010. In January 2011, the plaintiffs filed an amended complaint alleging that: (1) Amendment 20's limited access program violated 16 U.S.C. § 1853a by failing to protect and promote the interests of fishing communities, specifically by failing to develop procedures that would have allowed such communities to receive an initial allocation of privileges; (2) the program violated § 1853a by failing to restrict the authority to receive and hold privileges to those who "substantially participate" in the fishery; (3) NMFS violated various MSA national standards in

approving Amendments 20 and 21; and (4) NMFS violated NEPA in studying the Amendments.

The district court granted the plaintiffs' request to expedite the case under 16 U.S.C. § 1855(f)(4), and, after a hearing, granted summary judgment in favor of the defendants on all claims. *Pac. Coast Fed'n of Fishermen's Ass'n v. Locke*, 2011 WL 3443533 (Aug. 5, 2011) (unpublished). The court held that NMFS met its statutory obligations to fishing communities under the MSA, was not required to restrict privileges to those who "substantially participate" in the fishery, followed applicable national standards, and complied with NEPA. NMFS, the court wrote, "could have gone about the process of developing Amendments 20 and 21 differently and perhaps avoided at least some of the issues presently before the Court." *Id.* at *1. However, "the Court is not called upon to decide whether a different process might have been utilized or whether the path ultimately chosen . . . is the wisest policy." *Id.*

The plaintiffs filed a timely notice of appeal. We granted the plaintiffs' unopposed motion to expedite the appeal. The plaintiffs bring forward many, but not all, of the arguments they made below.[5]

## STANDARD OF REVIEW

We review the district court's summary judgment *de novo*. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010). Our review of NMFS's compliance with the MSA and NEPA is governed by the Administrative Procedure Act

[5]Two groups of amici who participated in the district court also participate on appeal. Supporting the plaintiffs is Food & Water Watch, Inc., a non-profit organization representing fishers, conservationists, and consumers. Supporting NMFS are the Environmental Defense Fund (an environmental conservation group) and United Catcher Boats and Midwater Trawlers Cooperative (fishing trade associations).

("APA"), 5 U.S.C. §§ 701-706, under which a court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," *id.* § 706(2)(A); *see also* 16 U.S.C. § 1855(f)(1) (APA governs NMFS's compliance with the MSA); *Pac. Rivers Council v. U.S. Forest Serv.*, ___ F.3d ___, 2012 WL 2333558, *6 (9th Cir. June 20, 2012) (APA governs agency's compliance with NEPA).

Under the APA's "arbitrary and capricious" standard, we must determine whether the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co.*, 462 U.S. at 105; *see also Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F.3d 710, 717 (9th Cir. 2002). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation and internal quotation marks omitted).

Finally, NMFS's interpretation of the MSA is reviewed under the two-step framework of *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). We ask first "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, we "must give effect to the unambiguously expressed intent of Congress," regardless of the agency's interpretation. *Id.* at 842-43. If, however, the statute is "silent or ambiguous" with regard to the issue, we next ask "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843 (footnote omitted). We must defer to the agency's interpretation if it is reasonable. *Id.* at 844 (holding that when Congress has left a gap for an agency to fill, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").

## DISCUSSION

### A.  NMFS complied with the MSA.

#### 1.  NMFS met its statutory obligations to fishing communities.

Section 1853a(c) of the MSA, entitled "Requirements for limited access privileges," contains various provisions related to fishing communities. Among other things, to be eligible to participate in a limited access program, fishing communities must "meet criteria developed by the relevant Council [and] approved by the Secretary" and "develop and submit a community sustainability plan." 16 U.S.C. § 1853a(c)(3)(A)(I). In developing participation criteria, the Pacific Council must consider factors such as traditional fishing practices, the "cultural and social framework relevant to the fishery," economic barriers to access, and economic and social impacts from the limited access program on fishery-dependent persons and businesses. *Id.* § 1853a(c)(3)(B).

**[1]** Section 1853a(c) also requires NMFS to "establish procedures to ensure fair and equitable initial allocations" of privileges. Such procedures must "include consideration of" current and past harvests, employment in the harvesting and processing sectors, investments in and dependent on the fishery, and "the current and historical participation of fishing communities." *Id.* § 1853a(c)(5)(A). In addition, NMFS must

> (B) consider the basic cultural and social framework of the fishery, especially through—
>
>> (i) the development of policies to promote the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries . . . ; and

> (ii)   procedures to address concerns over excessive geographic or other consolidation in the harvesting or processing sectors of the fishery.

*Id.* § 1853a(c)(5)(B). NMFS also must

> include measures to assist, when necessary and appropriate, entry-level and small vessel owner-operators, captains, crew, and fishing communities through set-asides of harvesting allocations, including providing privileges, which may include set-asides or allocations of harvesting privileges, or economic assistance in the purchase of limited access privileges.

*Id.* § 1853a(c)(5)(C). Finally, NMFS must "ensure that limited access privilege holders do not acquire an excessive share of the total limited access privileges in the program" by establishing a maximum share and "any other limitations or measures necessary," and must "authorize" privileges "to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery." *Id.* § 1853a(c)(5)(D)-(E).

The plaintiffs argue that the preceding provisions required NMFS to (1) develop criteria for ensuring that quota shares are distributed to fishing communities, and (2) adopt "other measures and policies" to ensure the sustained participation of fishing communities. NMFS responds that § 1853a(c) only required it to *consider* the sustained participation of fishing communities against other objectives, including by developing optional participation criteria or other measures, and that in any event Amendments 20 and 21 adequately serve to protect fishing communities.

**[2]** NMFS is correct. The allocation provisions of § 1853a(c)(5) require NMFS, in developing "procedures to

ensure fair and equitable initial allocations" of quota shares, to "includ[e] consideration of" four specific factors and to "consider" the "basic cultural and social framework of the fishery." *Id.* § 1853a(c)(5)(A)-(B). These provisions do not require that fishing communities receive an allocation of quota or, as the district court explained, "even be made eligible to do so." *Pac. Coast Fed'n of Fishermen's Ass'n*, 2011 WL 3443533, *6. Similarly, the plain language of § 1853a(c)(3) says that fishing communities must do certain things "[t]o be eligible" to participate in a fishery, including comply with "participation criteria for eligible communities" that NMFS develops. 16 U.S.C. § 1853a(c)(3)(A)-(B). But this language does not mandate that NMFS actually develop participation criteria. In short, § 1853a requires NMFS to take fishing communities into account in fashioning a limited access program (something NMFS did; *see infra*); it does not require NMFS to guarantee communities any particular role in that program. Congress could have taken any number of steps to guarantee fishing communities a specific role, but it did not.[6]

The plaintiffs rely on § 1853a(c)'s legislative history to supply mandatory requirements not found within the MSA itself. Although there is "no reason to resort to legislative history" where, as here, the statute is clear, *United States v. Gonzales*, 520 U.S. 1, 6 (1997); *see also Am. Rivers v. FERC*, 201 F.3d 1186, 1204 (9th Cir. 1999), legislative history nonetheless can be "instructive," *Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 728 (9th Cir. 2011). Here, § 1853a(c)'s legislative history actually underscores the fact that NMFS

---

[6]For example, Congress could have: (1) added requirements pertaining to participation criteria or allocations in the eleven requirements for limited access programs listed in § 1853a(c)(1); (2) imposed requirements on NMFS or the Pacific Council, not just on fishing communities, in subsection (c)(3); (3) used a word stronger than "consider" in subsection (c)(5); or (4) required an allocation to fishing communities in subsection (c)(5) in the same way it prohibited an allocation to regional fishery associations in subsection (c)(4).

was required only to consider fishing communities in developing a limited access program, not guarantee them a certain type or level of participation in it.

For example, the House Report on the bill that eventually would become § 1853a states that the bill "creates a discretionary authority and criteria for the allocation of shares to fishing communities and regional fishery associations." H.R. Rep. No. 109-567, at 32 (2006). In keeping with this permissive language, the Senate Report for the corresponding Senate bill states that the bill "contains specific provisions that would *authorize* the issuance of quota to fishing communities." S. Rep. No. 109-229, at 25 (2006) (emphasis added); *see also id.* at 8 (explaining that limited access programs would be "expanded to *allow* allocation of harvesting privileges to fishing communities . . . ." (emphasis added)).[7]

The plaintiffs alternatively argue that Amendments 20 and 21 "defy[ ] the National Standard 8 policy of fostering community participation in the fishery." But that standard requires only that conservation and management measures "*take into account* the importance of fishery resources to fishing communities by utilizing [the best available] economic and social data." 16 U.S.C. § 1851(a)(8) (emphasis added). As we have explained, "[t]he National Standards do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis. There is nothing in the MSA that guarantees [a particular group] a directed . . . fishery." *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 896 (9th Cir. 2010); *see also* 50 C.F.R. § 600.345(b)(2) ("[National] [S]tandard [8] does not constitute a basis for allo-

---

[7]Senator Daniel Inouye, one of the bill's sponsors, talked about his intent to reduce overcapacity but also "sustain thriving fishing communities" by "promot[ing] access to residents of our coastal communities." 152 Cong. Rec. S. 11,701, at 11,700 (Dec. 8, 2006). But even Senator Inouye referred only to the need to "consider" and "take into account" limited access programs' social and economic implications. *Id.*

cating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community.").

**[3]** The question remains whether NMFS met its obligations to consider fishing communities in fashioning Amendments 20 and 21. It did. NMFS recognized that fishing communities must be considered under the MSA; surveyed the current status of fishing communities (including observing that many are "faltering" under the status quo); described the effects of quota programs and other management tools on those communities; and explained how communities participated in the Pacific Council's decisions. In addition, NMFS proposed, and the Council adopted, various measures to mitigate the impacts of trawl rationalization on fishing communities, including, among other things: an adaptive management program under which up to ten percent of quota shares would be reserved for communities; a two-year moratorium on share transfers; a five-year review that includes a community advisory committee; and limits on the accumulation of shares by single entities. These measures will provide an "equitable initial allocation" of quota shares, "assist" entry-level participants and fishing communities, and prevent a single share holder from acquiring "excessive" shares. 16 U.S.C. § 1853a(c)(5)(A), (C)-(D).

It is true that, despite these measures, Amendments 20 and 21 may weaken at least some fishing communities. Yet NMFS was aware of the potential implications of approving Amendments 20 and 21. For example, NMFS explained in its final rule adopting the Amendments:

> While the trawl rationalization program would move the fishery toward some of its most important goals and objectives, in order for the program to realize those benefits, a large amount of consolidation would have to occur, resulting in fewer people employed in the fishery. The Council acknowledged

and expressed concern about the expected consolidation and its impacts, and noted the need to attend to the potential for disproportionate impacts on some communities. . . . The Council also expressed an interest in maintaining the character of the fleet and a diversified industry. Balancing the need for consolidation to generate adequate levels of benefit with the potential adverse impacts of consolidation was a major challenge. At the same time, continuation of status quo would have its own impacts, with both the buyback program and cumulative limits having caused significant consolidation in the fleet and a redistribution of vessels along the coast.

Because of the high degree of concern about impacts on communities and maintaining some sharing of benefits (both among harvesters and between harvesters, processors, and others dependent on the fishery) the Council made a number of tradeoffs in the trawl rationalization program that may prevent the program from reaching the full degree of economic efficiency that might otherwise be achievable through rationalization. For example, accumulation limits would help disperse fishery benefits, but would inhibit consolidation. Additionally, some [quota] was set aside for use in an [adaptive management program] to address such objectives as community and processor stability, new entry, conservation, and other unidentified/unforeseen adverse consequences. A number of other measures were also considered as the Council struggled to find a balance among sectors, states, vessels, ports, conservation obligations, and its responsibility to try to develop a regime that maximizes economic benefits while simultaneously realizing, recognizing, and honoring the social effects of its decisions.

75 Fed. Reg. at 60,872.

**[4]** In arguing that NMFS was required to adopt a policy that better protects the historic role of non-trawl fishing communities in the groundfish fishery, the plaintiffs seek relief the MSA does not require and this court is not empowered to grant. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A] reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute . . . . The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

### 2.   NMFS was not required to restrict quota shares to those who "substantially participate" in the fishery.

Section 1853a(c) provides:

(1) **In general**. Any limited access privilege program to harvest fish submitted by a Council or approved by the Secretary under this section shall—

. . . .

(D) prohibit any person other than a United States citizen, a corporation, partnership, or other entity established under the laws of the United States or any State, or a permanent resident alien, that meets the eligibility and participation requirements established in the program from acquiring a privilege to harvest fish, including any person that acquires a limited access privilege solely for the purpose of perfecting or realizing on a security interest in such privilege;

. . . .

(5) **Allocation**. In developing a limited access privilege program to harvest fish a Council or the Secretary shall—

. . . .

> (E) authorize limited access privileges to harvest fish to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery, including in a specific sector of such fishery, as specified by the Council.

. . . .

(7) **Transferability**. In establishing a limited access privilege program, a Council shall—

> (A) establish a policy and criteria for the transferability of limited access privileges (through sale or lease), that is consistent with the policies adopted by the Council for the fishery under paragraph (5) . . . .

16 U.S.C. § 1853a(c).

The plaintiffs argue that § 1853a(c)(5) and (c)(7) require NMFS to restrict the authority to receive and hold quota shares to those who "substantially participate" in the fishery. NMFS, however, construes § 1853a(c)(1)(D) to be the sole provision setting forth who is excluded from acquiring quota shares, and § 1853a(c)(5)(E) to mean "that those who substantially participate in the fishery must be among those eligible to acquire [shares], but are not the only entities or person[s] who can receive [shares]." 75 Fed. Reg. at 78,353.

**[5]** NMFS has the better argument, for three reasons. First, reading § 1853a(c)(5) and (c)(7) as the plaintiffs do requires

inserting the word "only" or "solely" into subsection (c)(5). The courts, however, "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009); *see also Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1020 (9th Cir. 1993) (explaining that the court "lack[s the] power" to "read into the statute words not explicitly inserted by Congress").

Second, while the MSA refers to "persons who substantially participate in the fishery" in § 1853a(c)(5), that phrase is not found in § 1853a(c)(1)(D), which is the only provision that specifies who may not acquire quota shares—*i.e.*, "any person other than" an American citizen, lawful permanent resident, or legal entity who meets "the eligibility and participation requirements established in the program." 16 U.S.C. § 1853a(c)(1)(D). "It is a general principle of statutory construction that when one statutory section includes particular language that is omitted in another section of the same Act, it is presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2003) (citation and internal quotation marks omitted).

**[6]** Third, limiting quota shares to those who "substantially participate" in the fishery would conflict with other parts of § 1853a(c). *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986) ("[W]here possible, provisions of a statute should be read so as not to create a conflict."). Section 1853a(c)(1)(D) allows a quota share (which is, once again, a type of "privilege") to be held by "any person that acquires a limited access privilege solely for the purpose of perfecting or realizing on a security interest in such privilege." 16 U.S.C. § 1853a(c)(1)(D). This allowance is inconsistent with limiting shares to "substantial participants" in the fishery. Similarly, § 1853a(c)(5)(C) directs NMFS to "include measures to assist, when necessary and appropriate, *entry-level . . .* owner-operators, captains, crew, and fishing communities through set-asides of harvest allocations, including providing privi-

leges." *Id.* § 1853a(c)(5)(C) (emphasis added). "Entry-level" persons and communities are, by definition, persons and communities who do not yet "substantially participate" in the fishery. Though the plaintiffs are correct that entry-level persons may join through community and regional fishing associations, nothing in the MSA limits them to those avenues.[8]

**[7]** Despite this commonsense reading of the MSA, the plaintiffs proffer four reasons why NMFS is obligated to limit quota shares to those who "substantially participate" in the fishery. First, the plaintiffs say it is "significant[ ]" that § 1853a(c)(1)(D) refers to "the eligibility and participation requirements established in the program." The implication is that NMFS was required to adopt eligibility criteria that accord with how the plaintiffs read the MSA. However, as the district court explained, the plaintiffs seek to "graft[ ] a *requirement* for agency action onto an *authorization* for agency action." *Pac. Coast Fed'n of Fishermen's Ass'n*, 2011 WL 3443533, *9 (emphasis added). That is, § 1853a(c)(1)(D) does not *require*, but rather simply *contemplates*, that "eligibility and participation requirements" may be "established in the program." Moreover, even if NMFS were required to establish eligibility criteria beyond those in the MSA, there is no mandate that those criteria screen out everyone who does not "substantially participate" in the fishery.[9]

Second, the plaintiffs point to certain statements in § 1853a(c)'s legislative history. Again, legislative history is

---

[8]Throughout most of NMFS's decisionmaking process, fishing communities expressed little or no interest in receiving an initial allocation of quota shares. Accordingly, NMFS developed other mechanisms (adaptive management, transferability and accumulation limits, etc.) to address the impacts of Amendments 20 and 21 on fishing communities.

[9]To the extent the plaintiffs argue that § 1853a(c)(5)(E) itself sets forth the "eligibility and participation requirements" referred to in § 1853a(c)(1)(D), that argument fails; § 1853a(c)(1)(D) plainly contemplates requirements "established in the program" by NMFS, not by the MSA.

irrelevant where, as here, the statute is clear. *Am. Rivers*, 201 F.3d at 1204. In any event, the best history the plaintiffs can point to is a Senate Report that states: "[S]ection [1853a] restricts the holding, acquisition, use, or issuance of [privileges] *only* to persons who substantially participate in a fishery." S. Rep. No. 109-229, at 26 (2006) (emphasis added). However, this statement, when read in context, plainly is concerned not with whether those who have not historically participated in the fishery should receive privileges, but with the possibility a person might obtain a privilege and then fail to use it, thereby effectively reducing the total allowable catch. *See id*.[10] Moreover, the corresponding House Report states that a very similar provision to § 1853a(c)(5) "*authorize[s]* all those who substantially participate in the fishery to hold a limited access privilege"—it does not say that the provision *restricts* privileges to that group.[11] H.R. Rep. No. 109-567, at 32 (July 17, 2006) (emphasis added).

Third, the plaintiffs refer to a November 2007 NMFS technical memorandum the Pacific Council considered when developing Amendments 20 and 21. The memorandum explains:

---

[10]The full paragraph reads: "[Privileges] are not intended to be used as a mechanism to reduce harvests through refinement of catch quota by those who are not fishery participants. Total quota available for harvest is established separately under the conservation requirements of the Act. Therefore, this section restricts the holding, acquisition, use, or issuance of [privileges] only to persons who substantially participate in a fishery."

[11]The plaintiffs also cite an individual representative's statement that the then-bill "protects small fishermen from those who would like to consolidate fisheries. The privileges are to be held by fishermen who are actively engaged and substantially participate in the fishery." 152 Cong. Rec. E2243-02 (daily ed. Dec. 27, 2006) (statement of Rep. Rahall). Even if this statement could be read to support the plaintiffs' argument, "[t]he floor statements of an individual member of Congress who did not sponsor the bill . . . have limited value in interpreting congressional intent." *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 702 (9th Cir. 1996).

The MSA does put some constraints on what the Councils can choose to do. As previously discussed, [§ 1853(c)(5)(E)] *links privileges to be acquired or held by persons to those who substantially participate in the fishery.*

. . . .

While the Councils have some latitude in determining who may or may not acquire harvesting privileges, it is certainly more restrictive than the "anybody can own" criterion mentioned above, *because of* the citizenship requirements and *the "substantially participate in the fishery" clause.*

(Emphasis added.) However, even this excerpt stands only for the proposition that privileges and participation are and must be "link[ed]," a requirement NMFS has satisfied by making substantial participants eligible to receive quota shares.

The plaintiffs' final argument is one of policy: allowing persons who do not substantially participate in the fishery to acquire and hold quota shares leads to "liberal transferability," which in turn can result in "extreme or excessive fleet consolidation, regional shifts in fishing commerce, loss of fishing-related employment[,]" and other effects. However, as discussed above, NMFS was aware of these effects but decided to partially prioritize economic efficiency and fleet consolidation over the protection of existing fishery participants, a choice that required fewer restrictions on who could acquire and hold quota shares. The MSA did not preclude NMFS from making that choice.

## B.   NMFS complied with NEPA.

### 1.   NMFS was not required to evaluate Amendments 20 and 21 and in a single EIS.

The plaintiffs argue that a single EIS was required for Amendments 20 and 21 under two NEPA regulations: 40

C.F.R. §§ 1502.4(a) and 1508.25(a)(1). Section 1502.4(a) states that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." Section 1508.25(a)(1), meanwhile, directs agencies to study "connected actions" in "the same impact statement," and sets forth criteria for determining whether actions are "connected."

[8] As an initial matter, the plaintiffs argue that a single EIS was separately required under both sections. However, § 1502.4(a) does not impose an independent test for determining when to study related actions in a single EIS. *Klamath Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 998 (9th Cir. 2004). Rather, as the section's full language makes clear, it directs agencies to § 1508.25 to make that determination:

> Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. *Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement.* Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

40 C.F.R. § 1502.4(a) (emphasis added). Thus, whether an agency must prepare a single EIS for more than one proposal turns on the criteria set forth in § 1508.25.[12]

---

[12]This conclusion is not undermined by dictum in *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893 (9th Cir. 2002), that "[a] single NEPA review document is required for distinct projects when there is a single proposal governing the projects, [citation], *or* when the projects are 'connected,' 'cumulative,' or 'similar' actions under the regulations implementing NEPA." (Emphasis added.) Both *Native Ecosystems Council* and the case it cites, *Kleppe v. Sierra Club*, 427 U.S. 390, 399, 410 (1976), were concerned with whether an EIS was required for nonexistent pro-

**[9]** Turning to those criteria, the plaintiffs argue that Amendments 20 and 21 are "connected" actions. Actions are "connected" if they:

> (i) Automatically trigger other actions which may require environmental impact statements.

> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.* § 1508.25(a)(1). By contrast, "[w]hen one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2000) ("The crux of the [independent utility] test is whether each of two projects would have taken place with or without the other . . . .") (citation and internal quotation marks omitted).

**[10]** Amendments 20 and 21 have independent utility, and thus are not connected actions under § 1508.25(a)(1). First, the two amendments have overlapping, but not co-extensive, goals. Whereas Amendment 20's goals are to increase net economic benefits, maximize allowable trawl harvests, consider environmental impacts, and improve individual account-

---

grammatic proposals, not whether two or more existing proposals were a "single course of action." In any event, we have since reaffirmed that § 1502.4(a) "directs the agency to use the 'scoping' provisions contained in 40 C.F.R. § 1508.25 to determine whether nominally separate proposals are a 'single course of action.' " *Klamath Siskiyou Wildlands Ctr.*, 387 F.3d at 998; *cf. Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306 (9th Cir. 2003) (explaining that Ninth Circuit case law requires "the preparation of a comprehensive EIS only for cumulative and connected actions," not "similar" actions).

ability of catch and bycatch, Amendment 21's goals are to simplify allocation decisions, support Amendment 20, and limit Pacific halibut bycatch. Similarly, whereas Amendment 20 is limited to trawling, Amendment 21 allocates catch limits between trawl and non-trawl sectors. While it is true the record is replete with statements about how Amendments 20 and 21 are linked, two actions are not connected simply because they benefit each other or the environment. *See Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1068-69 (9th Cir. 1995) (two actions were not connected merely because they both would benefit salmon); *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir. 1989) ("[E]ach [action] could exist without the other, although each would benefit from the other's presence.").

Perhaps more important than parsing NMFS's words or predicting whether it would adopt one Amendment without the other is answering the question whether, in preparing separate EISs, NMFS evaded its duty to fully study the combined effects of Amendments 20 and 21. This is the real concern behind § 1508.25. *See Great Basin Mine Watch*, 456 F.3d at 969 ("The purpose of this requirement is to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." (citation and internal quotation marks omitted)); *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1194 (9th Cir. 1997) (explaining that NEPA prevents an agency from "illegally segmenting projects in order to avoid consideration of an entire action's effects on the environment") (citing *Thomas v. Peterson*, 753 F.2d 754, 758-59 (9th Cir. 1985) (finding connected actions under § 1508.25)).

[11] This "divide and conquer" concern is not present here. NMFS prepared lengthy EISs that thoroughly studied the direct, indirect, and cumulative effects of Amendments 20 and 21, individually and together. The plaintiffs nonetheless argue that studying the two Amendments in separate EISs allowed

NMFS to "dismiss public comments . . . on the basis that they were made on the wrong EIS or were outside the scope of the particular amendment." However, the plaintiffs' record citations, and indeed the record as a whole, show just the opposite: NMFS clarified what each amendment did and substantively addressed the misdirected comment or referred the reader to the appropriate EIS, where those issues were always addressed. NMFS's decision to prepare two amendments, and hence two EISs, did not undermine its compliance with NEPA.

## 2. NMFS studied a reasonable range of alternatives.

[12] NEPA requires an agency to study a range of reasonable alternatives to the proposed action. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16; *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). The alternatives analysis is the "heart" of an EIS. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quotation marks and citation omitted). We "review an agency's range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998) (quotation marks, alteration, and citation omitted); *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) ("Under NEPA, 'an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative.' " (quoting *Headwaters, Inc. v. BLM*, 914 F.2d 1174 (9th Cir. 1990)))).[13]

---

[13]The Supreme Court has made clear that "inherent in NEPA and its implementing regulations is a 'rule of reason.' " *Dep't of Transp. v Public Citizen*, 541 U.S. 752, 767 (2004); *see also Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 551 (1976) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

**[13]** In this case, NMFS studied enough alternatives "to permit a reasoned choice." In Chapter 2 of the Amendment 20 EIS, NMFS studied in detail seven alternatives (four primary alternatives, two of which had sub-alternatives). These alternatives varied in many respects, ranging from how they managed catch, initially allocated privileges, and treated processors to the accumulation limits they set and the species they covered. The alternatives' most important difference was their "catch control tool"; whereas the "no action" or "status quo" alternative would have used trip and seasonal limits, the other alternatives proposed various types of quota systems or cooperatives. For Amendment 21, NMFS studied six alternatives in detail, which differed primarily based on how they allocated groundfish stocks among different sectors.

The plaintiffs object that NMFS considered only quota programs in the Amendment 20 EIS, "with no variations at all from NMFS's initial proposal (such as community shares, auctions, limited term shares, etc.)." In the plaintiffs' view, NMFS was required to "embrace the range of options an agency can lawfully pursue under its substantive mandates." This argument fails as a matter of law and a matter of fact. "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are 'infeasible, ineffective, or inconsistent with the basic policy objectives' " of the project. *N. Alaska Envtl. Ctr.*, 457 F.3d at 978 (quotation omitted); *Westlands Water Dist.*, 376 F.3d at 868, 871. NMFS identified Amendment 20's "purpose and need" as providing a trawl rationalization program that would improve economic efficiency and stability, consider environmental impacts, and reduce bycatch through individual accountability. NMFS reasonably determined that quota programs would be most effective in meeting these goals for most sectors, but it studied alternatives that differed in how those programs would be designed and implemented.[14] These

---

[14]Because project alternatives are based on an EIS's "purpose and need," 40 C.F.R. § 1502.13, an agency's alternatives analysis may be

alternatives allowed NMFS to fully vet the consequences of its actions.

Moreover, NMFS did consider catch control tools besides quotas. Most obviously, NMFS studied in detail a "no action" alternative that would have used trip and seasonal limits (the Pacific Council's current management tools) in place of quotas. NMFS also studied in detail three alternatives that would have used cooperatives rather than quotas, although only for sectors not at issue in this litigation. NMFS also briefly considered and rejected auctions, performance-based allocations, and area-based management. NEPA permits agencies to eliminate alternatives from detailed analysis so long as they "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

As for Amendment 21, the plaintiffs complain that NMFS studied alternatives that uniformly were based on recent catch

_____

inadequate if it draws its purpose and need statement too narrowly, *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070-72 (9th Cir. 2009). Only amicus Food & Water Watch argues that NMFS committed this error here; the plaintiffs do not raise this issue except in their reply brief, and then only tersely. *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 n.3 (9th Cir. 2010) ("[W]e decline to consider an argument raised only by [amicus] on appeal." (alteration in *Simmons*) (quotation marks and citation omitted)); *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are waived." (quotation marks and citation omitted)).

Even if this issue were properly before us, we would conclude that NMFS drafted reasonable statements of purpose and need for Amendments 20 and 21. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066-67 (9th Cir. 1998) (explaining that "this court has afforded agencies considerable discretion to define the purpose and need of a project," and accordingly reviews such a statement for reasonableness). NMFS's statements sought to further MSA-compliant management goals and were not so narrow as to leave only one viable alternative. *See Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1070; *City of Carmel-By-The-Sea, v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155-56 (9th Cir. 1997).

histories, with only "minor variations in the allocation methodology." As with Amendment 20, the plaintiffs overlook Amendment 21's purpose and need, which was to simplify management decisions by making fixed allocations, support trawl rationalization by eliminating the uncertainty of biennial allocations, and limit Pacific halibut bycatch. Thus, while the alternatives take the similar approach of making fixed allocations for certain stocks, they differ materially in how they would make those allocations—*i.e.*, based on recent total catch percentages for some or all sectors, on historical landed catch for some sectors, or on recent catch with carve-outs for certain species. These material differences allowed NMFS to thoroughly study the potential consequences of its action.

Finally, the plaintiffs contend that NMFS's decision was predetermined because NMFS "had selected all of the key features of their proposed trawl [quota] Program by September 2006," before NMFS prepared the EISs. The plaintiffs are incorrect. NMFS *identified* preferred alternatives at various points in the NEPA process, just as NEPA requires. *See* 40 C.F.R. § 1502.14(e); *see also Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) ("NEPA does not require that agency officials be 'subjectively impartial,' " only that "projects be objectively evaluated." (citation omitted)). However, NMFS did not *select* alternatives until the conclusion of the NEPA process. The planning and evaluation for Amendments 20 and 21 took seven years, during which time NMFS appropriately winnowed its options.

### 3.   NMFS adequately evaluated impacts on fish habitat and non-trawl fishing communities.

[14] An EIS must contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *City of Carmel-By-The-Sea*, 123 F.3d at 1150 (quotation marks and citation omitted). "Alternatively phrased, we review agency decisions to ensure that 'the agency has taken a "hard look" at the potential envi-

ronmental consequences of the proposed action.' " *Nw. Envtl. Advocates v. NMFS*, 460 F.3d 1125, 1133 (9th Cir. 2006) (quoting *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993).

Excluding appendices, the Amendment 20 and 21 EISs contain 384 and 102 pages of detailed effects analysis, respectively. The plaintiffs nonetheless complain that this analysis is inadequate because it focuses mostly on socioeconomic impacts; only a small portion is devoted to the Amendments' environmental effects, and an even smaller portion to the Amendments' effects on groundfish habitat specifically. In the plaintiffs' view, NEPA requires more, especially since the Amendments will, in their view, "ensure the long-term domination of trawling" in the fishery and trawling is harder on fish habitat than fishing using fixed gear.

**[15]** The plaintiffs are incorrect. Amendments 20 and 21 will not necessarily favor trawling over fixed gear relative to current management. The EISs explain that trawling is permitted under the existing fishery management plan and is responsible for the majority of the catch. Amendments 20 and 21 may actually decrease trawling's dominance by consolidating the trawling fleet, allowing trawlers to switch to fixed gear, and allocating more fish to non-trawlers than they have caught in recent years. NMFS will re-evaluate Amendment 21's allocations every five years.

The record is candid that the effects of Amendments 20 and 21 on groundfish habitat are less conclusive. The Amendment 20 EIS discusses "general shifts in fishing location [that] would translate to either an increase or decrease of trawling in certain areas." Rationalization would allow for shifts between trawl gear and fixed gear. Although fixed gear "is thought to be less destructive to bottom habitat" than trawl gear, and therefore could "reduce the impacts to habitat that is currently trawled," that switch also could aggravate adverse impacts by exposing currently-untrawled areas to fishing. The EIS supports this discussion with modeling, incorporates by

reference, pursuant to 40 C.F.R. § 1502.21, a previous comparative analysis of the effects of different types of gear on fish habitat, and refers readers to Amendment 19, which was specifically aimed at protecting fish habitat. *See* 71 Fed. Reg. 27,408 (May 11, 2006) (codified, as amended, at 50 C.F.R. pt. 660).

As for Amendment 21, NMFS explained that it would "not provide more bottom trawl opportunity than status quo management measures and allocations," and in fact would provide higher non-trawl allocations for most species than the status quo or any other alternative. Thus, even if trawl gear has more impacts than fixed gear on fish habitat, "potential adverse impacts from trawl gear could be expected to be lower under the proposed action than under" current management or other alternatives. These discussions may be less robust than the discussions of socioeconomic effects, but NEPA only requires agencies to discuss impacts "in proportion to their significance." 40 C.F.R. § 1502.2(b).

The plaintiffs' two remaining arguments lack merit. First, the Amendment 20 and 21 EISs extensively discuss potential effects on non-trawl communities. While the plaintiffs point specifically to the non-trawl community of Port Orford, Oregon, the Amendment 20 EIS at least mentions that community at several points, and the plaintiffs make no showing that the EISs' more general discussion of non-trawl communities does not apply to Port Orford.

Second, in arguing that NMFS failed to adequately study the impacts of trawling on groundfish habitat, the plaintiffs contend that NMFS also failed to comply with MSA National Standard 2, which provides that "[c]onservation and management measures shall be based upon the best scientific information available," 16 U.S.C. § 1851(a)(2), and with various other "action forcing" National Standards that promote conservation, *see id.* § 1851(a)(1), (4), (5), (9). NMFS, however, explained why Amendments 20 and 21 comply with each of

the National Standards; disclosed the potential impacts of trawling on habitat and identified uncertainty where it exists; and ultimately settled on amendments that promote conservation by posting observers on all boats, improving economic efficiency and individual accountability, and reducing bycatch.[15]

### 4.   MNMFS adequately considered mitigation.

**[16]** NEPA's implementing regulations require agencies to discuss potential mitigation measures in their EISs and decision documents. *See* 40 C.F.R. §§ 1502.14(f), 1502.16(e)-(h), 1505.2(c), 1508.25(b)(3); *see also id.* § 1508.20 (defining "mitigation"). Mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Methow Valley Citizens Council*, 490 U.S. at 353. Such discussion necessarily includes "an assessment of whether the proposed mitigation measures can be effec-

---

[15]The National Standards, and the MSA more generally, require NMFS to balance conservation with yield, not favor one at the expense of the other. *See Alliance Against IFQs v. Brown*, 84 F.3d 343, 349 (9th Cir. 1996) (observing this "tension" in the Standards). As NMFS explained,

> As management needs arise, the Council and NMFS respond to them. Amendment 19 established extensive protections for habitat. Amendment 20 maintains those protections while specifically addressing a separate management need for rationalization as described in the purpose and needs statement. While [fishery management plan] amendments must comply with the broad array of policy objectives in the MSA's National Standards and within the FMP, not every [plan] amendment will thoroughly address every management need in the fishery simultaneously. NMFS and the Council will continue to review the best available information regarding habitat needs and develop additional management measures if necessary and appropriate.

*Cf. Nw. Res. Info. Ctr.*, 56 F.3d at 1069 ("[W]e . . . cannot force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once. To do so risks further paralysis of agency decisionmaking.").

tive." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

Amendment 20 contains two primary mitigation features. The first is an "adaptive management program" under which up to ten percent of the quota shares each year will be set aside to address unforeseen effects, such as harm to fishing communities and barriers to entry for new participants. In the record, NMFS discussed, but did not adopt, criteria for deciding when and how to allocate these reserve shares, and stated that shares not used for adaptive management would be proportionally distributed to privilege holders. The second mitigation feature is a quadrennial review to make sure the program is meeting its goals, with the first review occurring five years after program implementation. The review process includes a community advisory committee. Amendment 20 also contains other measures expected to meaningfully reduce the impacts of trawl rationalization on fishing communities, such as caps on the accumulation of quota shares and an initial two-year moratorium on transferring shares. Amendment 21 contains a five-year review provision, but no other mitigation.

**[17]** The plaintiffs argue that these mitigation measures are vague, uncertain, and inadequate. However, we previously have found reasonably detailed mitigation evaluations like the ones at issue here to be sufficient. *See, e.g.*, *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 476-77 (9th Cir. 2000); *City of Carmel-by-the-Sea*, 123 F.3d at 1154; *see also Tillamook Cnty. v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) ("While the [agency] was required to develop the proposed mitigation measures 'to a reasonable degree,' it was not required to develop a complete mitigation plan detailing the 'precise nature . . . of the mitigation measures.' " (quoting *Wetlands Action Network*, 222 F.3d at 1121))). The plaintiffs also argue that there is no assurance that adaptive management reserve shares will be allocated to fishing communities. However, an "assurance" that a particu-

lar number of privileges will go to a particular purpose at a particular time is not only inconsistent with the notion of "adaptive management," it is not required by NEPA: "a mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (2000); *see also Methow Valley Citizens Council*, 490 U.S. at 352 ("There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.").[16] Moreover, NMFS explained that waiting to distribute privileges under the adaptive management program makes sense; the Amendments will be easier to implement, their effects will be more discernible, and the program will be better developed.

## CONCLUSION

The MSA requires NMFS to consider fishing communities in fashioning a limited access program, not to guarantee them a particular role in the program. The MSA also requires NMFS to make fishing privileges available to those who substantially participate in a fishery, not to restrict such privileges to that group. NMFS satisfied these duties and complied with the MSA's National Standards. As for NEPA, NMFS appropriately studied Amendments 20 and 21 in separate EISs, considered an adequate range of alternatives, evaluated the Amendments' impacts on fish habitat and non-trawl communities, and considered and adopted appropriate mitigation measures. The district court's judgment for the Federal Defendants-Appellees is **AFFIRMED**.

---

[16]An agency must implement the measures it chooses to adopt in its decision. *See* 40 C.F.R. § 1505.3. However, NEPA, as a purely procedural statute, does not require an agency to adopt particular mitigation measures.