ALLIANCE AGAINST IFQs; Lady Black-
ie, Inc.; Mako Haggerty; Mathew Dono-
hoe; Nancy L. Lande; Adrian Lecornu;
Howard Carlough; Jere Murray; Paul
K. Seaton; William Sullivan; Don Hall,
Plaintiffs–Appellants,

v.

Ronald H. BROWN, Secretary of Com-
merce; Clarence G. Pautzke, Executive
Director North Pacific Fishery Manage-
ment Council; Western Alaska Fisher-
ies Development Association, Defen-
dants–Appellees,

and

Peter M. Knutsen; Edwin Fuglvog; Rob-
ert J. Wurm; Andrew Scalzi; Nancy
Phillips, et al., Defendants–Intervenors–
Appellees.

No. 95–35077.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 9, 1995.

Decided May 22, 1996.

Susan E. Reeves, Rubini & Reeves, Anchorage, Alaska, for plaintiffs-appellants.

Martin W. Matzen, United States Department of Justice, Washington, D.C., for defendants-appellees.

Donald Craig Mitchell, Anchorage, Alaska, for defendants-appellees Western Alaska Fisheries Development Association.

George J. Mannina, Jr., O'Connor & Hannan, Washington, D.C., for intervenor-defendant Knutsen.

Before: HALL, WIGGINS, and KLEINFELD, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge:

The only issue in this case is whether regulations for implementing a fishery management plan in and near Alaska waters was arbitrary and capricious, or violative of the authorizing statute. We conclude that the regulations were a permissible exercise of authority by the Secretary of Commerce.

## I. FACTS AND REGULATORY FRAMEWORK

Commercial ocean fishing combines difficult and risky labor with large capital investments to make money from a resource owned by no one, the fish. Unlimited access tends to cause declining fisheries. The reason is that to get title to a fish, a fisherman has to catch it before someone else does. *Pierson v. Post*, 3 Caines 175, 2 Am. Dec. 264 (N.Y. 1805). This gives each fishermen an incentive to invest in a fast, large boat and to fish as fast as possible. As boats and crews get more efficient, fewer fish escape the fishermen and live to reproduce. "The result is lower profits for the too many fishermen investing in too much capital to catch too few fish." Terry L. Anderson and Donald R. Leal, *Free Market Environmentalism*, 123 (1991).

Congress made findings in the Magnuson Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1801 et seq., that "certain stocks of such fish have been overfished to the point where their survival is threatened," 16 U.S.C. § 1801(a)(2)(A), and that "[a] national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to ensure conservation, and to realize the full potential of the Nation's fishery resources." 16 U.S.C. § 1801(a)(6). Among the purposes of the Magnuson Act were providing for "fishery management plans which will achieve and maintain, on a continuing

basis, the optimum yield from each fishery," 16 U.S.C. § 1801(b)(4), and "establish[ing] Regional Fishery Management Councils to ... prepar[e], monitor[ ] and revis[e] such plans." 16 U.S.C. § 1801(b)(5). The Secretary of Commerce, pursuant to the Magnuson Act and the Northern Pacific Halibut Act of 1982 ("Halibut Act"), 16 U.S.C. § 773 et seq., promulgated regulations to limit access to sablefish and halibut fisheries in the Gulf of Alaska and the Bering Sea and Aleutian Islands area. *See* 50 C.F.R., Part 676.

The Secretary of Commerce implemented by regulation a management plan for sablefish and pacific halibut fishing. 50 C.F.R. §§ 676.10–676.25. The basic scheme is that any boat that fishes commercially for the regulated fish in the regulated area must have an individual quota share (IFQ) permit on board, specifying the individual fishing quota allowed for the vessel, and anyone who receives the regulated fish must possess a "registered buyer permit." 50 C.F.R. § 676.13(a). The regulated area consists of portions of the Gulf of Alaska, Bering Sea, and waters off the Aleutian Islands. 50 C.F.R. § 676.10(b).

The regional director of the National Marine Fisheries Service (NMFS) in the Department of Commerce assigns to each owner or lessee of a vessel which made legal landings of halibut or sablefish during 1988, 1989, or 1990, a quota share (QS) based on the person's highest total legal landings of halibut and sablefish during 1984 to 1990. 50 C.F.R. § 676.20(b). Each year, the regional director allocates individual fishing quotas (IFQs) by multiplying the person's quota share by the annual allowable catch. 50 C.F.R. § 676.20(f)(1). Subject to some restrictions, the quota shares and individual fishing quotas can be sold, leased and otherwise transferred. 50 C.F.R. § 676.21. If someone who did not fish in the regulated waters during 1988 to 1990 wants a quota share, he has to buy it from someone who did.

Like any governmental regulatory scheme, this one substitutes a governmental decision for myriad individual decisions to determine who shall be permitted to make money in the regulated industry. The plaintiffs are people who suffer from the economic impact of the regulation. Some have invested in fishing vessels and fished in the regulated waters for halibut or sablefish, but not during the critical three years which would give them a quota share. Some have consistently fished for the regulated fish in the regulated waters, but did not own or lease the boats. Of those who acquired quota shares under the scheme, some probably never fished, and just invested in fishing boats to get investment tax credits and depreciation. The regulatory scheme has the practical effect of transferring economic power over the fishery from those who fished to those who owned or leased fishing boats. For these reasons, among others, the case is troubling and difficult.

## II. ANALYSIS

■ The district court granted summary judgment in favor of the government and dismissed the complaint. We review a grant of summary judgment *de novo*. *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1440 (9th Cir.1990). Where we review regulations promulgated by the Secretary of Commerce under the Magnuson Act, our only function is to determine whether the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* at 1440–41 (quotation omitted). We determine only if the Secretary acted in an arbitrary and capricious manner in promulgating such regulations. *Id.* at 1441. *See also* 16 U.S.C. § 1855(b)(1)(B); 5 U.S.C. § 706(2)(A)–(D). We cannot substitute our judgment of what might be a better regulatory scheme, or overturn a regulation because we disagree with it, if the Secretary's reasons for adopting it were not arbitrary and capricious.

Plaintiffs urge us to adopt a more onerous standard of review and cite *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317 (9th Cir. 1995), as support. *Atwood* is distinguishable, because we were reviewing an ERISA plan fiduciary's duty, not those of the Secretary of Commerce, and were doing so in light of facts indicating a conflict of interest.

A. "Present Participation in the Fishery."

Congress erected various conditions on the Secretary's discretion to establish a limited access system for the fishery. Among the factors which the Council and Secretary must "take into account" is "present participation in the fishery." 16 U.S.C. § 1853(b)(6)(A):

**(b) Discretionary provisions.** Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may—

. . .

(6) establish a system for limiting access to the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account—

(A) present participation in the fishery,

(B) historical fishing practices in, and dependence on, the fishery,

(C) the economics of the fishery,

(D) the capability of fishing vessels used in the fishery to engage in other fisheries,

(E) the cultural and social framework relevant to the fishery, and

(F) any other relevant considerations;

The Halibut Act provides that limited access regulations "shall be consistent with the limited entry criteria set forth in section [303(b)(6) of the Magnuson Fishery Conservation and Management Act]." 16 U.S.C. § 773c(c).

The final rule was promulgated November 9, 1993. 58 Fed.Reg. 59,375 (1993). But the years during which people had to own or lease vessels and land halibut or sablefish, to obtain qualifying shares, were 1988, 1989 and 1990. 50 C.F.R. § 676.20(a)(1)(i). Plaintiffs argue that this violates the Congressional command to take into account "present" fishing. As they correctly observe, a person who last fished in 1988 would get a qualifying share, but someone who had fished only in 1991, 1992 and 1993 would not. Indeed, the complaint alleges that one of the plaintiffs fished for halibut in the regulated waters in 1975, 1977 through 1987, and 1992, but fished for salmon in Cook Inlet, not part of the regulated waters, during the three quota share years.

Substantial time was taken up between formulation of the plan and promulgation, by such activities as preparing environmental impact statements on the plan. In a 1992 environmental impact statement, the Council gave several reasons for using a 1990 cutoff. Perhaps the most persuasive was that if participation in the fishery while the rule was under consideration had been considered, then people would have fished and invested in boats in order to obtain quota shares, even though that would have exacerbated overcapacity and made no economic sense independently of the regulatory benefit:

There are two reasons why the end of the qualifying periods is 1990. First, extending it beyond that would have provided an incentive both for additional fishermen to enter the fishery and for previous entrants to adopt extreme fishing methods in order to increase their landings and, therefore, the [quota shares] they would receive if an IFQ program is implemented. This speculative activity would have intensified the race for fish and imposed substantial costs on the fishery in 1991. Second, it would have made it more difficult for a person to calculate what his [quota share] and IFQ would be by area for each of the alternatives being considered.

Extending the qualifying period past 1990 would benefit those who participated in 1991 compared to those who only participated prior to 1991. It would reward those who increased their participation in the 1991 fishery in the hope that the qualifying period would be extended. It could decrease the credibility of the Council process to the extent that potential or actual participants were led to believe that the period would not be extended. It would result in a broader dispersion of [quota shares] and increase the [quota shares] given to current participants. Finally, it would increase the cost of determining the [quota share] to be given to each person because it would require the use of an additional year of landing records and the resolution of the associated additional dis-

crepancies between agency data and vessel owner data.

The Secretary agreed that using a fishing year during the period that the plan was under consideration would exacerbate the overcapitalization problem the scheme was intended to mitigate. Here is his explanation in the Federal Register of November 9, 1993 (the day the final rule was promulgated), under the subtitle "Present participation in the fishery":

> Consideration of later years was abbreviated because the Council, which was formulating this policy in 1991, did not want to exacerbate overcapacity in the fishery by allowing speculative fishing in that year and subsequent years to qualify for an initial allocation of [quota share].

C.F.R. Parts 204, 672, 675, and 676.

This explanation does not fully answer the plaintiffs' argument. They point out that the Secretary did not comply with the statutory timetable for issuing regulations. The Secretary of Commerce has statutory deadlines for every step of the process after receipt of a plan from a Council. 16 U.S.C. § 1854(a). The Secretary violated every time requirement except perhaps the first. The Secretary received the plan from the Council October 26, 1992. 16 U.S.C. § 1854(a)(1)(C) requires that after receipt of the plan, the Secretary "immediately publish" in the Federal Register a notice stating that the plan is available and requesting comments. Notice was published on November 3, 1992. *See* 57 Fed.Reg. 49,676 (1992). On December 3, 1992, thirty-nine days after the receipt date, the Secretary published the proposed regulations, violating the 15–day requirement in 16 U.S.C. § 1854(a)(1)(D). Instead of allowing sixty days for public comment on the proposed plan, 16 U.S.C. § 1854(a)(1)(C), the Secretary only allowed 38 days. 58 Fed.Reg. 59,375 (1993). The final rule was not promulgated until November 9, 1993, 379 days after the receipt date. *Cf.* 16 U.S.C. § 1855(a) ("[t]he Secretary shall promulgate each regulation that is necessary to carry out a plan … within 110 days after the plan … was received").

Plaintiffs do not contend these procedural violations deprived the Secretary of jurisdiction to adopt the plan. *Cf. Brock v. Pierce County,* 476 U.S. 253, 259–60, 106 S.Ct. 1834, 1838–39, 90 L.Ed.2d 248 (1986); *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1399–1401 (9th Cir.1995). They argue, rather, that the Secretary's violations pushed what was supposed to be "present" participation in the fishery further into the past. The Secretary's nine-month delay in promulgating the final regulations, which helped create a three-year period between the last fishing considered and promulgation of those regulations, adds to our concern about whether the Secretary adequately considered "present participation in the fishery," as required by 16 U.S.C. § 1853(b)(6)(A). The question is closer because a portion of this delay is attributable to the Secretary's violation of the statutory timetables.

In the circumstances of this particular regulatory scheme, however, we do not think this delay should change the result. Congress left the Secretary some room for the exercise of discretion, by not defining "present participation," and by listing it as only one of many factors which the Council and the Secretary must "take into account." While the "participation" that the Council actually considered was admittedly in the "past" judged from the time when the final regulations were promulgated, it was roughly "present" with the time when the regulations were first proposed: The Council began its process on this plan in 1990, and considered participation in 1988, 1989, and 1990. The process required to issue a regulation necessarily caused substantial delay. The process of review, publication, public comments, review of public comments, and so forth, had to take a substantial amount of time, *see* 16 U.S.C. § 1854(a), and the environmental impact review also was lengthy, as it typically is, *see* 42 U.S.C. § 4332(2)(C). "Present" cannot therefore prudently be contemporaneous with the promulgation of the final regulations.

We further believe that the Secretary had a good reason for disregarding participation in the fishery during this lengthy process, because the alternative would encourage the speculative over-investment and overfishing which the regulatory scheme was meant to

restrain. Under the regulations, eligibility for quota shares depends on fishing during the years 1988, 1989, and 1990. Whatever years are used necessarily recede into the distant past. Even in 2005, assuming the regulatory scheme lasts that long, the quota shares will be based on fishing prior to 1991. Future generations of fishermen will continue to be governed by these pre–1991 allocations. Had the Secretary extended the 1990 cutoff, the incentive to pour money and time into the fishery in order to get a bigger quota share, for those who could afford a long term speculation, would have been enormous.

Thus, while the length of time between the end of the participation period considered and the promulgation of the rule pushed the limits of reasonableness, we are unable to characterize use of a 1988 through 1990 period as so far from "present participation" when the regulation was promulgated in 1993 as to be "arbitrary or capricious." *Washington Crab*, 924 F.2d at 1441. *See also* 16 U.S.C. § 1855(b)(1)(B); 5 U.S.C. § 706(2)(A)–(D).

B.  The "Fair and Equitable Standard."

Plaintiffs argue that the allocation of quota shares to vessel owners and lessees violates the statutory requirement that allocation be "fair and equitable to all such fishermen." 16 U.S.C. § 1851(a)(4). The statute requires that a fishery management plan comply with a number of national standards:

(a) **In general.** Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter [16 U.S.C. §§ 1851 et seq.] shall be consistent with the following national standards for fishery conservation and management.

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such *allocation shall be (A) fair and equitable to all such fishermen;* (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

16 U.S.C. § 1851(a) (emphasis added).[1]

Plaintiffs make the sensible argument that a crew member is just as much of a fisherman as a vessel owner. If all the quota shares go to vessel owners and lessees during that period, and none to the crew, as the Secretary's approved plan provides, then this violates the statutory command of fairness and equity to "all" the fishermen.

As the quoted section of this statute shows, the Secretary's duty was not solely limited to allocating quota shares fairly and equitably among the fishermen. The plan also had to "prevent overfishing while achieving, on a

---

1.  In their reply brief, Plaintiffs argue that the Secretary's final regulations violate §§ 1851(a)(1) and 1851(a)(3) as well. Because parties cannot raise a new issue for the first time in their reply brief, *Thompson v. CIR*, 631 F.2d 642, 649 (9th Cir.1980), we do not consider these arguments.

continuing basis, the optimum yield," 16 U.S.C. § 1851(a)(1), be "reasonably calculated to promote conservation," 16 U.S.C. 1851(a)(4), "promote efficiency," 16 U.S.C. § 1851(a)(5), "minimize costs and avoid unnecessary duplication," 16 U.S.C. 1851(a)(7), and achieve several other criteria. There is a necessary tension, perhaps inconsistency, among these objectives. The tension, for example, between fairness among all fishermen, preventing overfishing, promoting efficiency, and avoiding unnecessary duplication, necessarily requires that each goal be sacrificed to some extent to meeting the others.

The Council and Secretary directed their attention to the fairness problem plaintiffs raise, but decided that the other standards imposed by the statute required allocation of quota shares to boat owners and lessees as opposed to all the fishermen. The Council thought that equity to people who had invested in boats, and the greater ease of ascertaining how much fish boats, as opposed to individual fishermen, had taken, favored allocating quota shares according to owner and lessees of boats:

> There is no question that the IFQ program will restructure the current fixed gear fishery for halibut and sablefish. Some fishermen will be better off and some will be worse off under the IFQ program.... In brief, those persons benefited by receiving an initial allocation are vessel owners or lease holders.... The Council's rationale for this particular allocation is that vessel owners and lease holders are the participants who supply the means to harvest fish, suffer the financial and liability risks to do so, and direct the fishing operations.

> ....

> The advantaging of one group to the detriment of another is inherent in allocation.... The Council considered allocating [quota share] to crew members but decided against it because of the practical difficulties of documenting crew shares. Instead, the Council decided to give eligibility for initial allocations only to vessel owners and lease holders because they have a capital investment in the vessel and gear that continues as a cost after crew

and vessel shares are paid from a fishing trip.

58 Fed.Reg. 59,375, 59,378, 59,386 (1993) (final rule, codified at 50 C.F.R. Parts 204, 672, 675, and 676).

The Secretary thought that the problem of overfishing resulted more from investment in boats than occupational choices of fishermen, so the administrative remedy should be measured by ownership and leasing of boats:

> The Council's consideration of "present participation" also included the form of involvement in the fishery (e.g., as a vessel owner, crew member, or processor). As explained under national standard 4, above, the Council perceived vessel owners and lease holders as the most directly involved persons in terms of capital investment. The conservation and management problems resolved by this program stem largely from excess capital in the fisheries. Therefore, it is reasonable to define the group of persons who make the capital investment decision to either enter or exit a fishery as "present participants" for initial allocation purposes.

58 Fed.Reg. 59,375, 59,380 (1993) (final rule, codified at 50 C.F.R. Parts 204, 672, 675, and 676). The Secretary promulgated a regulation requiring that allocations be "rationally connected with the achievement of [optimum yield] or with the furtherance of a legitimate [fishery management plan] objective." 50 C.F.R. § 602.14(c)(3)(i)(A). In consideration of the fact that "[i]nherent in an allocation is the advantaging of one group to the detriment of another," the regulation provided:

> The motive for making a particular allocation should be justified in terms of the [fishery management plan]; otherwise, the disadvantaged user groups or individuals would suffer without cause....

> (B) An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups. An allocation need not preserve the status quo in the fishery to qualify as *fair and equitable,* if a

restructuring of fishing privileges would maximize overall benefits.

50 C.F.R. § 602.14(c).

■ Congress required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards in section 1851. "[U]nless the Secretary acts in an arbitrary and capricious manner promulgating such regulations, they may not be declared invalid." *Alaska Factory Trawler Ass'n v. Baldridge,* 831 F.2d 1456, 1460 (9th Cir.1987). Although the Secretary's approval of the plan sacrificed the interest of nonowning crew members to boat owners and lessees, the Secretary had a reason for doing that which was consistent with the statutory standards. Controlling precedent requires that a plan not be deemed arbitrary and capricious, "[e]ven though there may be some discriminatory impact," if the regulations "are tailored to solve a gear conflict problem and to promote the conservation of sablefish." *Id.* The Secretary is allowed, under this authority, to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole. *Id.*

The plan adopted will undoubtedly have an adverse impact on the lives of many fishermen who have done nothing wrong. Their entirely legitimate interest in making a living from the fishery has been sacrificed to an administrative judgment about conservation of fish and efficiency of the industry. That is, however, an unavoidable consequence of the statutory scheme. Despite the harshness to the fishermen who were left out, there is no way we can conclude on this record that the Secretary lacked a rational basis for leaving them out. The Secretary considered their interests, "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Washington Crab,* 924 F.2d at 1441. Because this standard was met, we do not have the authority to substitute our judgment for the Secretary's with regard to allocation of all the quota shares to boat owners and lessees.

**C. Primary Port.**

As part of the enforcement scheme, the Secretary has limited where fish can be unloaded and transferred from the harvest vessels. An "IFQ landing" is defined as "the unloading or transferring of any IFQ halibut, IFQ sablefish, or products thereof from the vessel that harvested such fish." 50 C.F.R. § 676.11. The general scheme for landings involves vessels clearances, with National Marine Fisheries Service inspection of individual fishing quota permits, buyer permits, and regulated halibut and sablefish. "Unless specifically authorized on a case-by-case basis, vessel clearances will be issued only by NMFS enforcement officers at ... primary ports." 50 C.F.R. § 676.17(a)(4). The regulations list as "primary ports" 16 towns in Alaska, and Bellingham, Washington. Plaintiffs argue that the inclusion of Bellingham, Washington, on the list was inappropriate. Listing Bellingham means, as a practical matter, that some vessels will harvest regulated fish in waters off Alaska, but the National Marine Fisheries Service will not clear the fish for sale until they get to Bellingham.

The regional fishery management council recommended that all clearances be at Alaska ports. Some of the federal fisheries regulators in Alaska, as well as fishermen in Alaska, were concerned that once the boats got away from Alaska, they could cheat by selling fish before they got to a non-Alaskan port. There is a lot of ocean between Alaska and Washington.

The Secretary added Bellingham to the list, despite this concern, for two reasons. First, the Secretary was concerned that if all fish had to be cleared at an Alaskan port, then the second sentence of the Ports Preference Clause of the United States Constitution would be violated. The Ports Preference Clause says:

No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State be obliged to enter, clear, or pay Duties in another.

Const. art I, § 9, para. 6. The Secretary did not make a finding that the clause would be violated, but rather chose to avoid possible

litigation over the question by adding a non-Alaskan port. Second, the Secretary elected to put Bellingham on the list, because it was an historic port for selling Alaskan halibut and sablefish. 58 Fed.Reg. 59,375, 59,392.

Plaintiffs argue that the Secretary had no authority to amend the fishery management plan by adding Bellingham, and could only approve the plan, disapprove it, or partially disapprove it. Under their interpretation, the Secretary should have sent the plan back to the regional council rather than adding a non-Alaskan port on his own.

Congress distinguished the Secretary's powers to alter the "fishery management plan" which the regional council submits, 16 U.S.C. § 1853(a), from his power to alter "regulations which the Council deems necessary or appropriate for purposes of carrying out a plan," 16 U.S.C. § 1853(c). Congress specifically empowered the Secretary to "make such changes in the proposed regulations submitted for the plan ... as may be necessary for the implementation of the plan." 16 U.S.C. § 1854(a)(1)(D)(i). The Secretary does not have the same powers over the plan: If "the Secretary determines that the plan ... is not consistent with the criteria, ... the Secretary shall notify the Council in writing of his disapproval or partial disapproval of the plan," 16 U.S.C. § 1854(b)(2). That way, "the Council may submit a revised plan or amendment, accompanied by appropriately revised proposed regulations, to the Secretary." 16 U.S.C. § 1854(b)(3)(A). Plaintiffs argue that the Secretary could not add Bellingham as a port because doing so changed the fishery management plan.

■ We have no difficulty reconciling subsection (b)(3), which empowers the council to submit a revised *plan*, with subsection (a)(1)(D)(i), which allows the Secretary to make changes on his own in the implementation *regulations*. Subsection (a)(1)(D)(i) authorizes the Secretary to change regulations which the Secretary deems necessary for implementation, without sending the plan back to the council. Designation of the locations for National Marine Fisheries Service vessel clearance was an enforcement concern which the Secretary could properly control in the implementation regulations. We therefore have no occasion to decide whether the Secretary could change the fishery management plan itself without sending it back to the council.

Plaintiffs argue that the practical effect of adding Bellingham to the implementing regulations is to make enforcement of the plan itself entirely impractical, so that the Secretary's amendment of the regulations should be treated as a change in the plan itself. They cite a memorandum from the Director of the National Marine Fisheries Service, Alaska Enforcement Division, saying that enforcement could not be accomplished if a Washington port were added. This is a matter of judgment entrusted to the Secretary, and although he reached a conclusion contrary to the recommendation of a knowledgeable subordinate in his department, the Secretary's judgment is not arbitrary and capricious.

D. Preemption Hearing.

The statute provides that "nothing in this [Act] shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries." 16 U.S.C. § 1856(a). If the Secretary finds "after notice and an opportunity for hearing" that "any state has taken any action ... which will substantially and adversely affect the carrying out of [his] fishery management plan," then "the Secretary shall promptly notify such State and the appropriate Council of such finding and of his intention to regulate the applicable fishery within the boundaries of such State." 16 U.S.C. § 1856(b)(1). This statute also provides that a state may later seek reinstatement of its authority over an area over which the Secretary has previously asserted jurisdiction. 16 U.S.C. § 1856(b)(2). Plaintiffs argue that the Secretary violated this state sovereignty provision of the statute by not giving notice and holding a preemption hearing before asserting jurisdiction over Alaskan waters.

Plaintiffs argue that the Secretary violated this state sovereignty provision of the statute, by not giving notice and holding a preemption hearing before determining that the fishery was "predominantly within the exclu-

sive economic zone and beyond such zone," 16 U.S.C. § 1856(b)(1)(A), and that the State of Alaska had taken or omitted to take action which would "substantially and adversely affect the carrying out of such fishery management plan." 16 U.S.C. § 1856(b)(1)(B).

Plaintiffs argue that the State of Alaska did not protect the fishermen's rights to a hearing on whether preemption of state authority was proper, so the fishermen should be enabled to enforce this statutory right themselves. In an amicus memorandum filed in district court, the State of Alaska said that it "joins with federal defendants and intervening defendants in countering plaintiffs' attempts to invalidate the [IFQ] program." However, "the state's support of the current federal IFQ program does not represent a waiver of the state's present and future fisheries management interests in state waters." We assume without deciding, for purposes of this portion of the discussion, that the Secretary did violate the State of Alaska's right to notice and a hearing before the federal government preempted the state's authority to regulate fishing in its own waters.

■ The State of Alaska, as a sovereign, and not the plaintiffs, would be the party affronted by interference with its sovereignty. Federal regulation of fishing in state waters interferes with the *state's* power to regulate conduct within its borders. The fishermen, being citizens of both the State of Alaska and the United States, and fishing within both, are subject to regulation by both. The invasion of the State of Alaska's sovereign interest in the power to regulate an activity within its own territory is not "an invasion of a legally protected interest," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), of the fishermen. The state could have, had it prevailed in a preemption hearing, imposed greater burdens on the aggrieved fishermen than did the federal government. We intimate no view on whether the State of Alaska would have been entitled to a hearing under section 1856, had it demanded one. The State of Alaska elected not to take action to protect whatever sovereign rights the state might have in this regulatory regime, and the sovereign rights belong to the state, not the individual fishermen. Failure to hold the statutory preemption hearing created no infirmity of which the fishermen could take advantage in this litigation.

## III. CONCLUSION

This is a troubling case. Perfectly innocent people going about their legitimate business in a productive industry have suffered great economic harm because the federal regulatory scheme changed. Alternative schemes can easily be imagined. The old way could have been left in place, where whoever caught the fish first, kept them, and seasons were shortened to allow enough fish to escape and reproduce. Allocation of quota shares could have been on a more current basis, so that fishermen in 1996 would not have their income based upon the fish they had caught before 1991. Quota shares could have been allocated to all fishermen, instead of to vessel owners and lessees, so that the nonowning fishermen would have something valuable to sell to vessel owners. But we are not the regulators of the north pacific halibut and sablefish industry. The Secretary of Commerce is. We cannot overturn the Secretary's decision on the ground that some parties' interests are injured. Government regulation of an industry necessarily transfers economic rewards from some who are more efficient and hardworking to others who are favored by the regulatory scheme. We have authority to overturn the Secretary's decisions only if they are arbitrary and capricious, or contrary to law. In this case, they are not.

AFFIRMED.