**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC DAWN LLC; JESSIE'S
ILWACO FISH COMPANY,
*Plaintiffs-Appellants,*

and

OCEAN GOLD SEAFOODS, INC.;
CHELLISSA LLC,
*Plaintiffs,*

v.

PENNY PRITZKER, Secretary of
the United States Department of
Commerce; NATIONAL OCEANIC
AND ATMOSPHERIC
ADMINISTRATION; NATIONAL
MARINE FISHERIES SERVICE,
*Defendants-Appellees,*

MIDWATER TRAWLERS
COOPERATIVE; TRIDENT
SEAFOODS GROUP; DULCICH,
INC., DBA Pacific Seafood
Group; ARCTIC STORM
MANAGEMENT GROUP, LLC;
ENVIRONMENTAL DEFENSE
FUND,
*Intervenor-Defendants-*
*Appellees.*

No. 14-15224

D.C. No.
3:13-cv-01419-TEH

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, Senior District Judge, Presiding

Argued and Submitted May 10, 2016
San Francisco, California

Filed August 3, 2016

Before: Sandra S. Ikuta, and Paul J. Watford, Circuit
Judges, and Derrick Kahala Watson,[*] District Judge.

Opinion by Judge Ikuta

**SUMMARY**[**]

**Magnuson-Fishery Conservation and Management Act**

The panel affirmed the district court's summary judgment
in favor of the National Marine Fisheries Service and
intervenors in an action brought by a fish harvester and a fish
processor, who are subject to a fishery management program
that limits their share of the total allowable catch of Pacific
whiting, challenging a 2013 decision by the Service to
calculate the amount of their initial share based on their

---

[*] The Honorable Derrick Kahala Watson, United States District Judge
for the District of Hawaii, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

participation in the fishery prior to 2003 and 2004, respectively.

The panel held that the Service's 2013 decision was not arbitrary or capricious because the Service considered the required factors and made a reasonable decision to use the 2003 and 2004 dates.

The panel rejected plaintiffs' claim that the Service's 2013 decision to select a qualifying period ending in 2003 for harvesters and 2004 for processors was arbitrary and capricious because it failed to take into account "present participation" in the fishery as required by 16 U.S.C. § 1853(b)(6)(A) of the Magnuson-Stevens Conservation and Management Act. The panel held that the record makes clear the Service considered "present participation," but reasonably gave it less weight than other factors.

The panel also rejected plaintiffs' claim that the Service's 2013 decision was arbitrary and capricious because it failed to take into account dependence upon the fishery as required by §§ 1853(b)(6)(B) and 1853a(c)(5)(A) of the Magnuson-Stevens Act.

**COUNSEL**

Tom Wyrwich (argued), Davis Wright Tremaine LLP, Seattle, Washington; James P. Walsh and Gwen L. Fanger, Davis Wright Tremaine LLP, San Francisco, California; for Plaintiffs-Appellants.

Maggie B. Smith (argued) and Bridget McNeil, Attorneys; Sam Hirsh, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Chris McNulty, Mariam McCall, and Ryan Couch, Office of the General Counsel, National Oceanic & Atmospheric Administration, Seattle, Washington; for Defendants-Appellees.

J. Timothy Hobbs (argued) and Michael F. Scanlon, K&L Gates LLP, Seattle, Washington, for Intervenors-Defendants-Appellees Midwater Trawlers Cooperative, Trident Seafoods Group, Dulcich, Inc., DBA Pacific Seafood Group and Arctic Storm Management Group, LLC.

Monica Goldberg (argued), Environmental Defense Fund, Washington, D.C., for Intervenor-Defendant-Appellee Environmental Defense Fund.

---

**OPINION**

IKUTA, Circuit Judge:

Pacific Dawn LLC and Jessie's Ilwaco Fish Co., a fish harvester and a fish processor, are subject to a fishery management program that limits their share of the total allowable catch of Pacific whiting. They challenge a decision

by the National Marine Fisheries Service (NMFS) to calculate the amount of their initial share based on their participation in the fishery prior to 2003 and 2004, respectively, rather than on their much greater participation in the years immediately before 2010, when the regulations implementing this program were issued. Because NMFS considered the required factors and made a reasonable decision to use the 2003 and 2004 dates, its decision was not arbitrary or capricious, and we affirm.

I

The Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) created eight Regional Fishery Management Councils. Each council must create a fishery management plan, which must meet a long list of statutory requirements. 16 U.S.C. § 1853(a). Among other things, the plan must be "consistent with the national standards" for fishery conservation and management. *Id.* § 1853(a)(1)(C). The National Standards are comprised of ten broad guidelines, including the requirements that the management measures "shall, where practicable, consider efficiency in the utilization of fishery resources," and "shall, where practicable, minimize costs and avoid unnecessary duplication." *Id.* § 1851(5), (7).

Beginning in 1990, the councils were given the discretion to use "a limited access system for the fishery in order to achieve optimum yield." *Id.* § 1853(b)(6). A limited access system is defined as "a system that limits participation in a fishery to those satisfying certain eligibility criteria or requirements contained in a fishery management plan or associated regulation." *Id.* § 1802(27). It limits the number of individuals who can enter and participate in the fisheries,

and gives these favored participants "privileges to harvest a specific quantity of fish." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1087 (9th Cir. 2012). In establishing a limited access system, councils must take into account "present participation in the fishery," *id.* § 1853(b)(6)(A), "historical fishing practices in, and dependence on, the fishery," *id.* § 1853(b)(6)(B), among other considerations.[1]

---

[1] 16 U.S.C § 1853(b)(6) provides:

> Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may: . . .
>
> (6) establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account—
>
> (A) present participation in the fishery;
>
> (B) historical fishing practices in, and dependence on, the fishery;
>
> (C) the economics of the fishery;
>
> (D) the capability of fishing vessels used in the fishery to engage in other fisheries;
>
> (E) the cultural and social framework relevant to the fishery and any affected fishing communities;
>
> (F) the fair and equitable distribution of access privileges in the fishery; and
>
> (G) any other relevant considerations.

In 2007, Congress reauthorized the Magnuson-Stevens Act with amendments that, among other things, were intended to encourage market-based fishery management through "limited access privilege programs." *Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1088. Such a program (which must be part of a limited access system) allows a fishery participant "to harvest a certain portion of the total catch allowed for a particular species." *Id.* One way to distribute the allocated portion is through "individual fishing quota" (IFQ), or quota shares. 16 U.S.C. § 1802(23), (26).[2] In developing such a program, a council must consider "current and historical harvests," as well as "investments in, and dependence on, the fishery," among other things. *Id.* § 1853a(c)(5)(A).[3]

---

[2] 16 U.S.C. § 1802(23) provides:

> The term "individual fishing quota" means a Federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units representing a percentage of the total allowable catch of a fishery that may be received or held for exclusive use by a person. Such term does not include community development quotas as described in section 1855(i) of this title.

Section 1802(26) provides:

> The term "limited access privilege" . . . means a Federal permit, issued as part of a limited access system . . . [and] includes an individual fishing quota.

[3] 16 U.S.C. § 1853a(c)(5) states, in pertinent part:

> In developing a limited access privilege program to harvest fish a Council or the Secretary shall– (A) establish procedures to ensure fair and equitable initial

Once a regional council has prepared a fishery management plan for each fishery within its jurisdiction that requires such a plan, it submits the plan (and any proposed regulations) to the Secretary of Commerce, *id.* § 1852(h)(1), who has delegated her responsibilities under the Act to the National Marine Fisheries Service (NMFS).[4]  The Secretary must review the plan to determine whether it is consistent with the National Standards and other statutory requirements, *id.* § 1854(a)(1)(A), as well as publish notice of proposed rulemaking in the Federal Register.  This publication starts a public notice and comment period.  *Id.* § 1854(a)(1)(B).  If the Secretary approves the plan, the Secretary must review the council's proposed regulations for consistency with the fishery management plan and other law.  *Id.* § 1854(b).  The Secretary must publish the regulations as well for public notice and comment.  *Id.*

One of the eight regional councils is the Pacific Fishery Management Council (Pacific Council), which consists of California, Oregon, Washington, and Idaho and covers the

---

allocations, including consideration of–

(i) current and historical harvests;

(ii) employment in the harvesting and processing sectors;

(iii) investments in, and dependence upon, the fishery; and

(iv) the current and historical participation of fishing communities.

[4] NMFS is housed in the National Oceanic and Atmospheric Administration in the Department of Commerce.

fisheries seaward of those states. *Id.* § 1852(a)(1)(F). One of those fisheries is the Pacific groundfish fishery, which "extends 200 miles into the Pacific Ocean, along the coasts of California, Oregon, and Washington, and includes more than 90 species of fish that dwell near the sea floor." *Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1088. The Pacific Council first developed the Pacific Coast Groundfish Fishery Management Plan (Groundfish Management Plan) in 1982. It covers Pacific whiting, the species of fish at issue here, among other groundfish, and contains various goals and objectives. One of those objectives is Objective 14, which states that when the Council is "considering alternative management measures to resolve an issue," the Council should "choose the measure that best accomplishes the change with the least disruption of current domestic fishing practices."

Prior to 2004, the Pacific Council established a yearly harvest limit for whiting and limited the number of fishing vessels by requiring vessels to have a limited entry permit, and parceling out only a limited number of such permits. In addition, the Council established a short season for whiting and allowed permitted vessels to harvest whiting only from the time the season opened until the time the catch limit was reached. This management structure led to a so-called "derby-style fishery" and "a race for fish," meaning that the limited number of permit holders engaged in an intense, concentrated effort at the beginning of the season because of the potentially short window.

Because this approach did not meet the Pacific Council's management goals, it began contemplating an amendment to the Groundfish Management Plan in 2003. In January 2004, NMFS published a notice of proposed rulemaking, which

stated that the Pacific Council was considering implementing a limited access privilege program in the form of a "trawl rationalization program" for the Pacific groundfish fishery. Advance Notice of Proposed Rulemaking Regarding a Trawl Individual Quota Program and to Establish a Control Date, 69 Fed. Reg. 1563-01 (Jan. 9, 2004). For the shorebased trawl sector (which consists of vessels that catch and deliver to processors on land), the trawl rationalization program would consist of a trawl IFQ program, which is "a quota system where each quota share could be harvested at any time during an open season." *Id.* at 1563. Participants in the fishery (i.e., those who already had a limited entry permit allowing them to fish) would need to obtain a quota share permit as well in order to receive a share of the allowable catch. 16 U.S.C. §§ 1853a, 1802(26). The Pacific Council believed this trawl rationalization program would cause participants in the fishery to spread their fishing throughout the season and avoid the race for fish.

The proposed rulemaking also explained that the Pacific Council was considering basing the initial allocation of quota shares on participants' catch history in the fishery, meaning that participants that had a larger catch history would be allocated a larger quota share. Due to concerns that the announcement of this new program would create a perverse incentive by encouraging participants to increase their fishing efforts in order to qualify for a larger initial quota share, NMFS announced "a control date of November 6, 2003," which would apply to "[p]ersons potentially eligible for [individual quota] shares," including "vessel owners, permit owners, vessel operators, and crew." 69 Fed. Reg. 1563-01, 1563. A "control date announces to the public that the Pacific Council may decide not to count activities occurring after the control date toward determining a person's qualification for

an initial allocation or determining the amount of initial allocation of quota shares." *Id.* In 2005, NMFS clarified that processors (in addition to harvesters) could also be eligible to obtain quota shares. Trawl Individual Quota Program and Establishment of a Control Date, 70 Fed. Reg. 29,713-01, 29,714 (May 24, 2005).

The Pacific Council then engaged in a lengthy process to develop an amendment to the Groundfish Management Plan. Due to the complexity and controversial nature of the trawl rationalization program, the process of analyzing data, obtaining input from stakeholders and the public, and developing program documents took over five years. In 2009, the Pacific Council finally submitted the trawl rationalization program to the Secretary as Amendment 20 to the Groundfish Management Plan. NMFS published the proposed amendment for comment in May 2010, Amendments 20 and 21, Trawl Rationalization Program, 75 Fed. Reg. 26,702-01 (May 12, 2010), and the proposed regulations for implementing Amendment 20 in June 2010, Amendments 20 and 21, Trawl Rationalization Program, 75 Fed. Reg. 32,994-01 (June 10, 2010).

After a round of notice and comment, NMFS adopted Amendment 20 to the Groundfish Management Plan and promulgated implementing regulations. Amendments 20 and 21, Trawl Rationalization Program, 75 Fed. Reg. 60,868-01 (Oct. 1, 2010). The program allocated quota share to various participants in the fishery based on activity during a qualifying time period. The qualifying time period for harvesters ended in 2003, *id.* at 60,959 (promulgated as 50 C.F.R. § 660.140(d)(8)(iv)(C)(2)), while the qualifying time period for shoreside processors ended in 2004, *id.* at 60,955 (promulgated as 50 C.F.R. § 660.140(d)(8)(iv)(G)).

The selection of the 2003 and 2004 end dates was a focus of comment and criticism, and NMFS responded to these criticisms in detail.  NMFS noted that it had set a 2003 control date in order "to prevent future fishery disruptions" and to "discourage entry into a fishery and increased harvest while the Council goes through the process of developing the program details."  75 Fed. Reg. 60,868-01, 60,875.  Having set a control date, NMFS deemed it was important to maintain that date in setting the qualifying history period for two reasons.  First, the Council would lose credibility if it did not adhere to the control date: "If the Council develops a pattern of announcing and abandoning control dates, then the announcement of control dates will become a signal to harvesters to intensify their efforts to catch fish in order to increase their odds of qualifying for greater initial allocations."  *Id.*  Second, according to NMFS, "abandoning the original control date would reduce the perceived fairness of the program by rewarding those who fished speculatively after the control date . . . at the expense of those who heeded the control date."  *Id.*

After Amendment 20 (the trawl rationalization program) became effective January 1, 2011, *id.* at 60,868, a group of fishing companies brought a lawsuit challenging NMFS's initial allocation of quota shares for Pacific whiting.  *See Pacific Dawn, LLC v. Bryson*, 2011 WL 6748501 (N.D. Cal. Dec. 22, 2011) (*Pacific Dawn I*).  Among other claims, the plaintiffs contended that the Pacific Council and NMFS erred in its selection of a qualifying period, and that it should have considered fishing history past the 2003 and 2004 end dates. *Id.* at *1.  The district court held that NMFS failed to provide a reasonable explanation for why it relied on an end date of 2003 for some purposes and 2004 for other purposes, and the court granted plaintiffs' motion for summary judgment on

that issue. *Id.* at \*6–8. The district court remanded the matter to NMFS for reconsideration and set a deadline of April 1, 2013, for the agency's decision, but it did not vacate the rule so as not to cause disruption during the remand period. *Pac. Dawn, LLC v. Bryson*, 2012 WL 554950 (N.D. Cal. Feb. 21, 2012).

On remand, the Pacific Council considered four alternative date ranges for qualifying history, including ranges that took more recent history into account (1994–2007 and 1994–2010), and a "no action" alternative, which maintained the end dates of 2003 for harvesters and 2004 for processors. After three meetings over six months, more than seven hours of public testimony, and numerous reports, the Pacific Council recommended that NMFS adopt the no action alternative. Reconsideration of Allocation of Whiting, 78 Fed. Reg. 72-01, 72 (Jan. 2, 2013). NMFS determined that the council's recommendation was consistent with the Magnuson-Stevens Act and issued notice of its decision to retain the original control dates for public comment. *Id*.

On March 28, 2013, NMFS issued a response to the comments and the final rulemaking, which retained the original control dates. Reconsideration of Allocation of Whiting, 78 Fed. Reg. 18879-01 (Mar. 28, 2013). In sum, NMFS concluded that "there are fundamental and compelling reasons to maintain the existing initial allocations of whiting," including "not rewarding increases in harvesting or processing that occurred after the end of the qualifying periods," maintaining the credibility of control dates "for this and future rationalization programs," and "minimiz[ing] the concentration of harvester quota." *Id.* at 18880. NMFS also responded to the various comments in detail.

After NMFS's decision, two of the plaintiffs in *Pacific Dawn I*, Pacific Dawn LLC (a fish harvester) and Jessie's Ilwaco Fish Co. (a fish processor) (collectively referred to here as "Pacific Dawn"), brought this action in district court, alleging that NMFS failed to consider relevant factors under the Magnuson-Stevens Act and the Groundfish Management Plan. A number of harvesters and processors who participate in the fishery and the Environmental Defense Fund intervened as defendants. The district court rejected Pacific Dawn's arguments and granted summary judgment to NMFS and the defendants. Pacific Dawn appealed.

II

The district court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo. *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 894 (9th Cir. 2010).

Actions taken by the Secretary under regulations implementing fishery management plans are "subject to judicial review to the extent authorized by, and in accordance with," the Administrative Procedure Act (APA). 16 U.S.C. § 1855(f). Judicial review under the APA allows courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To determine whether the agency's decision was arbitrary and capricious, the court must consider whether the decision was based on a consideration of the relevant factors required by the statute, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633,

645–46 (1990), but "the court is not empowered to substitute its judgment for that of the agency," *Overton Park*, 401 U.S. at 416; *see also Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996).

An agency's decision may "be found to be arbitrary and capricious 'if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise.'" *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1066 (9th Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But where the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," the decision is not arbitrary or capricious. *Alliance Against IFQs*, 84 F.3d at 345 (quoting *Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1440 (9th Cir. 1990)); *Yakutat*, 407 F.3d at 1066. "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1091 (internal quotation marks and citations omitted).

## III

On appeal, Pacific Dawn argues that NMFS's 2013 decision to select a qualifying period ending in 2003 for harvesters and 2004 for processors was arbitrary and capricious because it failed to take into account "present participation in the fishery" as required by § 1853(b)(6)(A)

and dependence upon the fishery as required by §§ 1853(b)(6)(B) and 1853a(c)(5)(A) of the Magnuson-Stevens Act. We consider each of these arguments in turn.

## A

We begin with Pacific Dawn's argument that NMFS's 2013 decision to retain 2003 and 2004 as the ending date for the qualifying period failed to take into account "present participation in the fishery" as required by § 1853(b)(6). We see no basis for this claim. Rather, the record makes clear that NMFS considered "present participation," but reasonably gave it less weight than other factors.

NMFS first explained its analysis of this issue in the preamble to the final rule implementing Amendment 20 (the trawl rationalization program) and the regulations implementing that amendment in 2010. In its response to comments, NMFS stated that the Pacific Council and NMFS had "analyzed and considered data including past and present participation," among other relevant considerations. 75 Fed. Reg. 60,868-01, 60,885. Nevertheless, it explained that "the Council is required to consider and balance several factors, including current harvests and historic harvests, when making initial allocation decisions," and while "the Council did examine present participation levels, the Council gave greater weight to historic participation in determining the initial allocation." *Id.*

NMFS's 2013 decision again addressed the comments that NMFS should "adopt a present participation requirement for the period of 2003–2010," rather than retain the end dates of 2003 and 2004, and NMFS again found that other factors outweighed the "present participation" concern. NMFS

stated that maintaining the qualifying period end dates of 2003 and 2004 "supports the Council's and NMFS' efforts to reduce overcapitalization and end the race for fish by not rewarding increases in harvesting or processing that occurred after the end of the qualifying periods (i.e., after the 2003 control date)." 78 Fed. Reg. 18,879-01, 18,880, 18,884–85 (Mar. 28, 2013).[5] Further, maintaining the qualifying period was necessary to "support the importance of the control date for this and future rationalization programs, minimize the concentration of harvester quota, and provide for a wider initial geographic distribution of the program benefits along the coast and the corresponding fishing communities." *Id.* at 18880. NMFS concluded that these "key factors" outweighed "the reasons supporting alternatives that favor more recent history." *Id*.

NMFS's explanation for giving more weight to historic participation and maintaining the 2003 and 2004 end dates for the qualifying period is similar to the reasoning we found persuasive in *Alliance Against IFQs v. Brown*, 84 F.3d 343 (9th Cir. 1996). In that case, the Secretary of Commerce implemented a management plan for sablefish and Pacific halibut by regulation. *Id.* at 345. The management plan required vessel owners who participated in those fisheries to obtain an IFQ permit. *Id.* NMFS assigned to each owner or lessee of a vessel that landed halibut or sablefish during 1988, 1989, or 1990, a quota share based on the person's "highest total legal landings" during 1984 to 1990. *Id.* The plaintiffs challenged these regulations, arguing that the 1990 end date failed to take into account "present participation in the

---

[5] "Overcapitalization" in this context means "too many resources directed at too few fish." *Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1087.

fishery," 16 U.S.C. § 1853(b)(6)(A), because the final rule was promulgated in 1993 and did not credit landings during 1991and 1992. *Id.* at 347. We upheld the Secretary's decision, in part because Congress listed "present participation" as "only one of many factors which the Council and the Secretary must 'take into account.'" *Id.* We concluded that the Secretary "had a good reason for disregarding participation in the fishery during this lengthy process, because the alternative would encourage the speculative over-investment and overfishing which the regulatory scheme was meant to restrain." *Id.* at 347–48.

*Alliance Against IFQs* also determined that the Secretary's selection of the end dates could be deemed to be consistent with "present participation." *Id.* at 347. We noted that the term "present participation" was not defined in the statute. *Id.* Given the "substantial amount of time" required to complete the regulatory process, including the "process of review, publication, public comments, review of public comments," and the environmental impact review, we held that the Secretary could reasonably conclude that "present participation" did not mean "contemporaneous with the promulgation of the final regulations." *Id.* We concluded that "while the length of time between the end of the participation period considered and the promulgation of the rule pushed the limits of reasonableness," especially given that one of the reasons for the delay was the Secretary's failure to meet regulatory deadlines, the use of the period from 1988 to 1990 was not "so far from 'present participation' when the regulation was promulgated in 1993 as to be 'arbitrary or capricious.'" *Id.* at 347–48.

In this case, we are doubtful that individuals' participation in the fisheries in 2003 or 2004, which was six or seven years

before Amendment 20 and the implementing regulations were promulgated in 2010, can be deemed to constitute "present participation." Nor has the Secretary made such an argument.[6] Nevertheless, the Secretary's reasons for giving less weight to present participation, such as not rewarding increases in fishery activity after the control date was announced and maintaining the credibility of control dates in the future, are sufficient to uphold the Secretary's actions. The record shows that NMFS gave careful consideration to the "present participation" factor and acted reasonably in giving more weight to establishing and maintaining a control date for reasons we upheld in *Alliance Against IFQs*, 84 F.3d at 347. Because the Secretary "articulated a rational connection between the facts found and the choice made," *see id.* at 350, we conclude the decision to maintain the 2003 and 2004 end dates was not arbitrary or capricious.

Pacific Dawn raises two arguments against this conclusion. First, it challenges NMFS's conclusion (set forth in the final environmental impact statement that supported NMFS's 2013 decision) that taking current participation in the fishery into account would have only a minor impact on the allocation of quota shares. *See* Final Environmental Impact Statement ("While a recent participation requirement might be considered reasonable and responsive to the [Magnuson-Stevens Act] direction to consider current and historic participation and to consider investment and dependence, the likely impacts on the initial [quota share] allocation appeared to be minimal with respect to their impact on the landing history based portion of the allocation.") According to Pacific Dawn, because NMFS used a 2003 and

---

[6] Further, the plaintiffs do not argue that the development process was unduly prolonged.

2004 end date, 34 permit holders who no longer participate in the fishery received a quota share, which constitutes almost 20 percent of the total number of permit holders that received quota shares.   Pacific Dawn argues that this means a significant portion of the economic benefits of the trawl rationalization program were given to permit owners who are not participating in the fishery, which disadvantages current participants who have made significant economic investments in the fishery.  NMFS's failure to consider the significant financial impact of its decision to retain the 2003 and 2004 end dates, Pacific Dawn argues, makes NMFS's decision arbitrary and capricious.

We reject this argument because NMFS considered the issue and reasonably determined that the financial impact of the end dates was not significant and did not outweigh other benefits.  NMFS acknowledged that 34 permit holders would receive quota share under Amendment 20 even though they had not actively participated in the fishery since 2003, but it concluded that this fact did not warrant "including more recent years in the qualifying period" because the majority of these 34 permit owners were far from inactive; rather, they had been "active in the whiting fishery during those years, participated in other fisheries including other sectors of the whiting fishery, or held those inactive permits as an investment."   78 Fed. Reg. 18,879-01, 18,883.   NMFS determined that only 1.5 percent of the permits (rather than 20 percent) were truly inactive.  *Id.* at 18,884.  Moreover, NMFS noted that maintaining the 2003 and 2004 end dates spread the benefits of the program more widely and avoided concentrating quota share in the hands of a few participants. *Id.* at 18,880.  According to NMFS, this goal outweighed the reasons for adopting alternatives "that favor more recent history." *Id.*  Because NMFS considered this issue, weighed

it against other factors that it must take into account, and determined that the other factors outweighed Pacific Dawn's concerns, NMFS did not fail to "consider an important aspect of the problem" or offer "an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Because we cannot substitute our judgment for the agency's, *Overton Park*, 401 U.S. at 416, and must only determine whether the agency "articulated a rational connection between the facts found and the choice made," *Yakutat*, 407 F.3d at 1066, we conclude that NMFS's determination on this point was not arbitrary or capricious.

Second, Pacific Dawn argues that NMFS's application of "present participation" was arbitrary because it adopted a 2004 end date for processors rather than the 2003 end date adopted for harvesters. According to Pacific Dawn, NMFS failed to give a satisfactory explanation for this inconsistency. Again, we disagree. NMFS explained its reasons for using a different end date for determining the eligibility of processors for quota share. First, NMFS explained that "it was not clear until 2005 that the 2003 control date potentially applied to processors," and NMFS concluded that the different end date was necessary to account "for processor investments that took place prior to the announcement of the control date but that did not begin to earn processing history until 2003 and 2004." 78 Fed. Reg. 18,879-01, 18,880–81. Second, because processors have onshore facilities, and cannot "move into and out of various fisheries to gain potential fishing history" as easily as harvesters, there was less danger of creating perverse incentives by changing the control date. *Id*. NMFS explained its reasoning and related its determination to other statutory factors, such as "the economics of the fishery" and a "fair and equitable distribution." *Id.* at 18,889–91; *see* 16 U.S.C § 1853(b)(6). We therefore conclude that NMFS's

decision to apply the 2004 control date to processors was not arbitrary or capricious.

B

Closely related to its argument that NMFS did not take into account "present participation," Pacific Dawn also argues that NMFS's 2013 decision did not adequately consider "dependence" on the fishery. *See* 16 U.S.C. §§ 1853(b)(6)(B), 1853a(c)(5)(A). According to Pacific Dawn, NMFS's 2013 decision to maintain the 2003 and 2004 end dates did not give adequate weight to current dependence on the fishery because it allocated quota shares to individuals who had not necessarily fished in the past ten years and therefore were not necessarily dependent on the fishery. This error, Pacific Dawn contends, made NMFS's 2013 decision inconsistent with various provisions of the Magnuson-Stevens Act, Objective 14 of the Groundfish Management Plan, and NMFS's past practices in other fisheries.

Again, we see no basis for this claim. In proposing to retain the 2003 and 2004 end dates, NMFS provided a thorough explanation of its methodology for evaluating "dependence." 78 Fed. Reg. 72-01, 74–76. Although the Magnuson-Stevens Act does not define "dependence," NMFS defined the term to mean "the degree to which participants rely on the whiting fishery as a source of wealth, income, or employment to financially support their business." *Id.* at 74. Further, "[c]urrent harvests, historical harvests, levels of investment over time, and levels of participation over time are all aspects of dependence, as they can all be connected to the processes that fishers and processors use to generate income." *Id.* In addition, the proposed rule explained that it was not NMFS's policy "to use recent fishing as the only

reflection of dependence on the fishery," nor was it NMFS's policy "to use recent fishing as the sole basis for determining the allocation period; such a determination must always be based on the specific facts each time allocations are considered." *Id.* at 75.

With respect to the proposed decision on the 2003 and 2004 end dates for allocating quota shares, NMFS explained its analysis of dependence. First, NMFS stated that it gave weight to financial dependence in its "choice of ending the qualifying period for processors in 2004 rather than the 2003 control date," because that change "was done to explicitly recognize investments in processing while still furthering the purposes of Amendment 20." *Id.* at 74–75. Second, while recognizing that its chosen end date for harvesters would result in allocating a small percentage of quota shares to harvesters "without activity in the whiting fishery post 2003," NMFS stated that awarding quota share in this small number of cases was outweighed by the need to serve other goals. *Id.* at 75. After considering dependence upon the fishery and weighing dependence against other factors, NMFS proposed not to change its end dates because "the existing qualifying periods for harvesters and processors result in a fair and equitable allocation." *Id.* at 74.

In its final decision on this issue, NMFS reiterated that it had "thoroughly explored" the "issue of investment and dependence for more recent years." 78 Fed. Reg. 18,879-01, 18,884. NMFS determined that retaining the qualifying period ending in 2003 or 2004 would not unduly affect current dependence on the fishery because "most current harvesters and processors in the fishery were also historical participants during the qualifying periods for initial allocation, and the shifts in quota among the initial allocation

alternatives considered were relatively modest overall and for a majority of the participants." *Id*. Moreover, NMFS repeated its conclusion that there were "valid policy reasons for excluding those years," including the "fair and equitable" distribution of access privileges. *Id*. at 18,885; *see* 16 U.S.C. § 1853(b)(6). Because NMFS adequately took into account "dependence on the fishery" under § 1853(b)(6)(B) and "investments in, and dependence upon, the fishery" under § 1853a(c)(5)(A)(iii), its decision was not inconsistent with those statutory requirements. *See Yakutat*, 407 F.3d at 1066.

Nor was NMFS's decision inconsistent with the related standards identified by Pacific Dawn. First, Pacific Dawn argues that NMFS's 2013 decision was inconsistent with National Standards 5 and 7,[7] which require councils to, "where practicable, consider efficiency in the utilization of fishery resources" and "minimize costs and avoid unnecessary duplication." 16 U.S.C. §§ 1851(a)(5), (7). Pacific Dawn claims that NMFS's allocation of quota shares to individuals who are not dependent on the fishery results in inefficiencies and creates additional costs and duplication of expenses for current participants who must purchase or lease additional quota shares. This claim is belied by the record; NMFS reasonably concluded that the use of the 2003 and 2004 end dates was consistent with National Standards 5 and 7 because the trawl rationalization program as a whole minimized costs and efficiently used fishery resources to the

---

[7] The plaintiffs also argue that the agency violated National Standard 4, which states that allocation of fishing privileges should be "fair and equitable," 16 U.S.C. § 1851(a)(4). But the plaintiffs did not raise that argument to the district court in their motion for summary judgment or opposition to the defendants' motion for summary judgment, so the argument was waived. *See Lands Council v. McNair*, 629 F.3d 1070, 1079 n.4 (9th Cir. 2010).

extent practical. 78 Fed. Reg. 18,879-01, 18,888. According to NMFS, Amendment 20 was designed to make the groundfish trawl fishery economically efficient by reducing excess capacity and levels of incidental catch, and the selection of the 2003 and 2004 end dates would not affect these efficiency gains. *Id*. NMFS acknowledged that the initial allocation of quota shares could result in "transition costs and disruption to participants' operations," but the new costs would result in additional benefits to fishery participants, and the transaction costs would decrease "as the fishery moves to its long-term, more efficient state" because "operations will move, or quota will be traded, to the ports in which the highest profits can be earned." *Id.*

Second, Pacific Dawn claims that NMFS's decision to retain the 2003 and 2004 end dates was contrary to the Groundfish Management Plan's direction in Objective 14 to "choose the measure that best accomplishes the change with the least disruption of current fishing practices." Pacific Dawn argues that NMFS failed to provide a rational explanation for how the exclusion of ten years of fishing history meets Objective 14 and argues at length that the 2003 and 2004 end dates disrupt the activities of participants currently dependent on the fisheries. We again disagree. NMFS considered Objective 14, 78 Fed. Reg. 72-01, 75, and reasonably determined that retaining the 2003 and 2004 end dates would be the least disruptive to current fishing practices. NMFS explained that when it first announced the 2003 control date, participants were on notice that fishing activity after 2003 might not count toward allocation of quota share, and participants had the opportunity to acquire additional quota shares. 78 Fed. Reg. 18,879-01, 18,881. Maintaining the original control date in the final rule "rewards investments and dependence consistent with the

policies underlying announcing a control date, and minimizes disruption to those participants that made business decisions based on the assumption that quota formulas were unlikely to include more recent years." *Id.* at 18888. Because NMFS reasonably determined that retaining the 2003 and 2004 end dates would be the least disruptive to current fishing practices, its conclusion was not inconsistent with Objective 14 of the Groundfish Management Plan.

Finally, Pacific Dawn argues that NMFS's decision was inconsistent with its practices in other fisheries, where NMFS had concluded that more recent participation reflected greater dependence on the fishery. This argument fails. NMFS considered "the reasons supporting alternatives that favor more recent history (e.g., recognizing recent fishery participants' dependence and investments, reducing future quota leasing or acquisition costs, reducing quota to recent non-participants, and reflecting more recent market and fishery conditions)," but reasonably determined that they were outweighed by other factors such as "reducing overcapitalization and ending the race for fish." *Id.* at 18,880. NMFS reasonably relied on its policy to review the facts of each case "each time allocations are considered." 78 Fed. Reg. 72-01, 74. Its conclusion was thus not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

IV

We conclude that NMFS properly considered the relevant factors and reasonably decided to maintain the 2003 and 2004 end dates. *See Alliance Against IFQs*, 84 F.3d at 345. We therefore affirm the district court's grant of summary judgment to the defendants.

**AFFIRMED**.